UTICA,
Aug. 1824.

Whitney
v.
American
Insurance
Company.

WHITNEY *against* THE AMERICAN INSURANCE COMPANY.

The contract in a valued policy is to pay the assured the whole valuation, if the subject of the policy be lost; and the valuation in the policy is conclusive as to the amount of recovery, if the subject be lost by the perils insured against, unless there be fraud or imposition in fixing the value.

Where the insurance was of goods, valued at $14,000, on board a ship and the returns of those goods on a voyage out and home; and the goods in the course of the voyage round were delivered to L. upon his advance of $7,000, and his receipt, promising to answer drafts of the assured to $3,000 more; the goods to be sold by L. for his re-imbursement and the proceeds remitted to the assured; and the $7,000 were vested in a return cargo, together with $1621, for which he drew on L. making in the whole an investment to $8469,85; and L. paid the draft as he had agreed; and the return cargo was lost by the perils insured against; and the outward cargo, on actual sale, did not bring enough to re-imburse L. by $4680,26, for which he drew on the assured; *held*, that the assured was entitled to recover, as for a total loss, the $14,000, and interest.

But it would be otherwise, if part only of the value of the goods had been invested in the return cargo.

ASSUMPSIT on a policy of Insurance, tried the 13*th April*, 1822. at the *New-York* sittings, before Mr. Justice WOODWORTH; when a verdict was taken, by consent, for the plaintiff for $20,000, subject to the opinion of the Court, and to adjustment, upon the following case, with liberty to either party to turn it into a special verdict or bill of exceptions.

The policy was dated *July* 7*th*, 1818, and was effected by the plaintiff in his own name, and upon his own account, and underwritten by the defendants, upon all kinds of lawful goods and merchandizes, laden or to be laden on board the ship *America*, *Vibberts*, master, on a voyage at and from *New-York* to *Bourbon*, with liberty to use the Isle of *France*, and two ports in *Java*, and back to a port of discharge in the *United States*, and with liberty to use either port first, being upon 137 whole, and 48 half pipes of wine out, and *returns home*, valued at $14,000, being the sum insured, at a premium of 6 *per cent.* to return one half *per cent.* for each port not used, and the risk ending safely. By a memorandum endorsed on the policy, signed by the defendants, and dated the 21*st* day of *July*, in the same year, in consideration of an additional premium of one *per cent.* permission was given by the defendants to use *Calcutta*, without prejudice to the policy, the one *per cent.* to be returned, if the permission should not be used.

The policy, in all other respects, was in the usual printed

UTICA,
Aug. 1824.

Whitney
v.
American
Insurance
Company.

form of policies commonly used in the city of *New-York*, and either party had permission to refer to it upon the argument.

On the 3*d* of *July* in the same year, the plaintiff shipped, and laded on board the *America*, in the port of *New-York*, for his own account, the wine specified in the policy, the invoice cost of which was $14028,87, and took from Capt. *Vibberts* a bill of lading, under that date, for the wine thus shipped, deliverable at the Isle of *France* to *Elmslie Garrigues* and *William A. Field* or their assigns, as the consignees, who went out in the *America* as supercargoes upon the voyage insured.

The ship *sailed* from the port of *New-York* with the wine on board upon the voyage insured, on or about the 7*th* of of *July* in the same year, and arrived in safety at *Bourbon*, on or about the 21*st October* following, where she remained a short time, and proceeded thence to *Batavia*, being a port in *Java*, at which latter place she arrived in safety, having the insured wine still on board, on or about the 25*th* day of *December* in the same year.

At *Batavia*, the supercargoes, owing to the depressed state of the market at that time, being unable to dispose of the wine there, unless at a very great sacrifice, made an arrangement with *Abraham E. Loesman* of that place, by which he was to receive the wine for sale, and make an advance upon it of $7,000, and permit the supercargoes to draw upon him from *Calcutta* to any amount not exceeding $3000 more, the whole of which was supposed to be less than what the proceeds of the wine would be, he holding the wine for his reimbursement, and accounting to the plaintiff for the proceeds when sold. The wine was, pursuant to this arrangement, landed at *Batavia*, and by the consignees and supercargoes delivered to *Loesman*, who thereupon gave them a receipt in the following words : " *Batavia, January* 15, 1819. Received from *Elmslie Garrigues* & *William A. Field*, supercargoes of the ship *America*, of *New-York*, one hundred and thirty six pipes, and forty-seven half pipes of *Catalonia* wine, to be sold by me for account of Mr. *Stephen Whitney*, merchant, *New-York*, and proceeds to be remitted to him. (Triplicate.) *A. E. Loesman*."

UTICA,
Aug, 1824.

Whitney
v.
American
Insurance
Company.

*Loesman* accordingly advanced in *Batavia*, and upon the receipt of the wine, 6930 Spanish dollars and 69 cents to the supercargoes, for the use and benefit of the plaintiff, which sum, allowing one *per cent.* premium for Spanish dollars, made the sum of $7000. The supercargoes thereupon gave *Loesman* a receipt for the advance in these words : " *Batavia, January* 18, 1819. Received of Mr. *A. E. Loesman* six thousand nine hundred and thirty Spanish dollars, and sixty-nine cents, which, with one *per cent.* for Spanish dollars, will make seven thousand dollars.

<em>Elmslie Garrigues,</em> for self &<br><em>Wm. A. Field.</em>"

6930 69
69 31
_____
$7000

The supercargoes, on the same day, shipped and laded the dollars on board the *America,* in *Batavia,* and took a bill of lading therefor, signed by Captain *Vibberts,* deliverable to themselves at *Calcutta.* The ship, with the dollars on board, sailed from *Batavia* on or about the 1*st* of *February,* 1819, and proceeded direct for *Calcutta,* at which latter place she arrived in safety with the specie, on or about the 28*th March* following.

While the *America* lay at *Calcutta,* the supercargoes received the specie from Captain *Vibberts,* and with it, and the amount for which they drew on *Loesman,* purchased there goods for the account of the plaintiff, the invoice cost of which was $8469,85 ; for the difference between which and the advance made by *Loesman,* they drew on him to the amount of $1621, pursuant to the arrangement between them, and he paid that sum accordingly.

The goods so purchased in *Calcutta* were there by the supercargoes shipped and laded on board the *America,* for which they took Captain *Vibberts'* bill of lading, dated in *Calcutta* the 20*th* of *June,* 1819, deliverable to the plaintiff, or his assigns, in *Philadelphia,* that being understood and intended as the ship's port of discharge in the *United States,* upon her return. The *America,* with a valuable cargo, including these goods, left *Calcutta* on or about the 1*st* day of

UTICA,
Aug. 1824.

Whitney
v.
American
Insurance
Company.

*July* following for *Philadelphia ;* and was afterwards, on or about the 19*th December* following, and before the termination and in the due prosecution of the voyage, cast away and totally lost near *Sandy Hook* by means of the perils insured against.

*Loesman* subsequently sold the wines deposited with him, which, after debiting the plaintiff with the $7000 advanced, and the $1621 drawn for by the supercargoes, and crediting the plaintiff with the nett proceeds of the wine, left a balance due from the plaintiff to *Loesman* of $4680,26, for which amount he drew upon the plaintiff.

*G. Griffin,* for the plaintiff, took two grounds ; 1. That the policy being a valued one, and on the voyage round, the valuation is to regulate the amount of the recovery ; 2. It makes no difference that the return cargo was purchased with monies advanced in anticipation of the sales of the outward cargo, as the whole of its proceeds, and even a greater amount, were, in fact, invested in the return cargo.

1. Insurances, he said, are of two kinds, open and valued. In the latter, the valuation always controls unless there be fraud. (*Lewis et al.* v. *Rucker,* 2 *Burr.* 1171. *Feise et al.* v. *Aguilar,* 3 *Taunt.* 506. *Miner* v. *Tägert,* 3 *Bin. Rep.* 204. *Hodgson* v. *Mar. Ins. Co.* 3 *Cranch,* 110, 111, *per Cushing, J.* The *Mar. Ins. Co. of Alexandria* v. *Hodgson,* 6 *Cranch,* 206. *Davy* v. *Hallett,* 3 *Caines' Rep.* 16. *Kane* v. *The Commercial Ins. Co. of N. Y.* 8 *John. Rep.* 229.) And the fraud must be gross and palpable, like the case put by Lord *Mansfield* in *Lewis* v. *Rucker ;* an insurance of £2000, when the insured had no interest beyond a cable. In *The Marine Ins. Co. of Alexandria* v. *Hodgson,* the difference in value was $2000, that is, the valuation at $10,000, and the real value at $8000 ; yet this striking difference was not admitted in evidence, because there was no fraud. Here goods were shipped beyond the value in the policy. A valued policy upon goods will not be opened where there is no fraud, except in the single instance of leaving part of the goods on shore, upon the same principle that a valued poli-

UTICA,
Aug. 1824.

Whitney
v.
American
Insurance
Company.

cy upon freight was opened in *Forbes* v. *Aspinall*, (13 *East*, 323.)

2. The return cargo was the *returns* of the wines within the language of the policy, and indeed upon the most rigid technical construction of the term. It makes no difference whether the wines were hypothecated or sold, to procure the return cargo. It was not only the same in its legal, but in its actual effect; for the wines were finally sold to pay the money actually invested in the proceeds. *Haven* v. *Gray*, (12 *Mass. Rep.* 71) is a case precisely in point for the plaintiff, except in the single particular that the word *proceeds* is used there instead of *returns* as here.

Nor let it be said that this is a hard case. There must be some fixed and uniform rule applicable to both parties. Suppose the case had been the other way, the goods lost far above the value insured, would the Court open the policy for the benefit of the assured? This never would be thought of. *Shawe* v. *Felton*, (2 *East*, 109) shows the inflexibility of the rule. The assurers were holden to the value; though the property was deteriorated before the loss, by the act of the assured himself. I appeal particularly to the strong language of Ld. *Kenyon* in that case, (*p.* 114 & 115.)

*J. Duer & D. B. Ogden*, for the defendants, made the following points : 1. That the policy never attached upon the goods lost, they not being the returns of the outward cargo ; 2. If the defendants are liable, it is only for a partial loss ; 3. If the policy be construed to attach upon the goods lost, although not the returns of the outward cargo, the loss should be adjusted as upon an open policy.

They said, the plaintiff claims $14,000, when, by his own shewing, he has lost but about $8000. The general presumption of law is, that an insurance is for the mere purpose of indemnity ; and where a party sets up an agreement controlling the general intendment of law, he must, as in all cases of a special agreement, bring himself precisely within its terms. What did the parties understand by *wines out*, and *returns home ?* It is said the latter words mean any returns. This we deny. It must be returns *of*

*the wines.* To constitute this, the wines should be exchanged for, or sold and invested in the return cargo. If any thing else had been meant, would not the parties have said so in their contract? The plaintiff understood the sense of the clause as we do, at the trial; and the struggle was to shew the return cargo purchased on the credit of the outward cargo.

The parties also intended that, to make the policy attach on the return cargo, there should be a *total* shipment of the *whole* proceeds—not a partial one. The contrary course would give rise to frauds innumerable. One fourth in value may be re-shipped,—lost; and the whole original value recovered; and by and by, the residue sold in a foreign country. The underwriters have nothing to do with the market. It was *Whitney's* duty to *sell* the wine, and invest it in a return cargo; for which alone the defendants were liable. An advance of $10,000 might have been had, for it was offered; but only $8,000 were received. The truth is, the whole was no more than a loan by *Whitney,* and an after purchase entirely distinct from, and independent of the avails of the outward cargo. The wine was pledged merely as a collateral security; and the receipt concludes with a promise *to remit the proceeds;*—When? Why, *when sold;* and yet it is now contended that, even before the wines were sold, their proceeds had been shipped, and were on their return voyage. The supercargoes then gave a receipt for the money, without saying on what account, and whether on the credit of *Whitney,* or the wines. *Loesman* has since drawn upon *Whitney* for the balance over and above the avails. *Whitney's* personal credit was evidently pledged. Then the money was not the proceeds of the wine, but of *Whitney's* credit. The rights of the parties are to be tested by the state of things at the time the cargo was shipped—not by any thing which transpired afterwards.

It never should be the interest of the assured, that a loss should happen. In *Forbes* v. *Aspinall,* cited for the plaintiff, a case of valued policy on freight, exactly analagous in principle, the reasoning of Lord *Ellenborough,*

Ch. J. meets the present case precisely. " And so, (says he) if, by the perils insured against, the *freight* of *part on-ly* of the goods to be carried be lost, the assured can only recover in respect to that loss, according to the proportion which that part bears to the whole sum at which the entire freight was estimated in the valuation. If, for instance, the insurance be generally upon goods, and the goods intended to be protected, be 500 hogsheads of sugar, and a valuation be made accordingly, but the ship, by accident, takes on board 100 only, and sails, and is afterwards lost by one of the perils insured against, with those 100 on board ; can it be contended that the assured shall recover to the full amount of the valuation, that is, for the whole 500, when he has lost only 100 ? So in the case of freight ; if the ship would carry 500 tons, and in fixing the valuation, the assured calculate his freight upon 500 tons, but when he reaches the loading port, he can get 10 tons only upon freight, and sails upon the voyage insured, with those 10 tons only ; is it to be allowed, that if the ship be lost by any of the perils insured against, and he thereby loose freight upon 10 tons, he shall be entitled to the valuation, which includes the freight upon 500 tons ? And yet to this extent the plaintiff's argument in this case is carried. The proposition is monstrous. Instead of confining the policy, as it ought to be confined, to a contract as nearly as may be of indemnity, against what may be lost in respect of freight by the perils insured against, it converts it into a contract of indemnity against a different class of accidents, which may operate to prevent the assured from being able to procure a full cargo upon freight, and may make it the interest of the assured, which it never ought to be, that a loss should happen." So here, the plaintiff asks the Court to convert this contract into the risk of a market in *India ;* or the circumstance which, prevented his getting the full proceeds on board, as a return cargo.

Rather than admit this consequence, the Court will divide the policy, making it a valued one on the outward, but an open one on the return cargo. If the construction contended for by the plaintiff be correct, we should be liable to

the extent of the valuation, though the return cargo should contain but a single bale of goods. Of the value of the outward cargo, the parties always have the means of judging. In this case, all the articles were enumerated. The paties presumed they would continue at the value fixed throughout the voyage. As to this, they ran a mutual risk. After the avails of the outward, are once fairly invested in a return cargo which is shipped, the policy is not to be opened, merely because the latter may be worth less than the former. It was upon this principle, that *Havens* v. *Gray*, cited for the plaintiff, was decided. (*Philips on Ins.* 311.) We admit that *Havens* v. *Gray* appears to be against us as to the return cargo being really the proceeds of the outward ; yet, however respectable the Court by whom that case was decided, it is not binding upon this tribunal. This Court will not yield to it as an authority ; but only so far as the arguments by which it is supported shall be found convincing.

*J. O. Hoffman*, in reply. It is very easy to cite and establish the general principle, that insurance is for indemnity merely ; but to what extent is the saying applicable ? This must depend on the nature of the contract ; and accordingly the rule never extends to a valued policy. The valuation is for the very purpose of avoiding the question of indemnity according to the value. In an open policy, the two items of proof are the loss and the value. Upon a valued policy, you stop at the first ; for the agreed valuation is the measure of damages. In this valuation, it is right to include certain charges which would not be reached by an open policy, and you may anticipate port charges, extraordinary duties, commissions, and even freight. The whole may be covered by the valuation. Hence the principle that nothing shall avoid the valuation short of fraud. (*Philips on Ins.* 306.) Even gaming policies are allowable in this state : for the statute, 19 *Geo.* 2, has not been enacted here. All the law on this question, will be found collected in *Philips on Insurance*, 307.

I admit, as a general principle, that the underwriter is

not to be affected by the fall of the market. But I deny that the rule extends to a valued policy. Here, even the market may be insured.

I admit that the valuation was on the outward cargo, and I agree, that if only part of the returns were on board at the time of the loss, the plaintiff is entitled to no more than a *pro rata* allowance. But the entire proceeds were on board. I am at a loss to discover how, when the advance is on the credit of the fund, you can distinguish it from the proceeds of the fund. There can be no doubt that the credit of the wines was employed. They were deposited as security. If the advance had been on *Whitney's* personal credit solely, I agree that it could not be considered the *returns* or *proceeds* of the wines. But the outward cargo was applied in payment. *Loesman* received it for sale, made an advance of $7000, and authorized a draft for the whole ; and a partial draft was answered, *conformably to the arrangement*. So says the case in terms. It might as well be said that money is advanced on the *personal* credit of a mortgagor, or by a factor who holds the goods of his principal, or by a consignee of goods under the usual agreement to answer drafts for ⅔ of the value. Were we bound to take the market as we found it, and make an absolute sale at a sacrifice ? or lie by and wait for a market till the vessel rotted ? No. The object was a speedy sale and investment, if to be had. According to gentlemen, we could even recover back the premium, because no risk on the return cargo ever commenced. The ground taken, certainly leads to this extravagant consequence. No. The object of all was, that a home investment should be as large as possible. Had we sold for a trifling sum, the defence would have been fraud in the sale.

But the question is with us upon authority. *Havens* v. *Gray* has been questioned ; and to this has been opposed the authority of Lord *Ellenborough*, in *Forbes* v. *Aspinall*. If there be any difference in the two cases, *Havens* v. *Gray* is as binding here as *Forbes* v. *Aspinall*. The former was decided at *nisi prius*, by that great master of commercial law, the late Ch. J. *Parsons* ; and his decision was

sanctioned by the learned Judges of the Supreme Court of *Massachusetts*, after full deliberation, in the time of his successor, Ch. J. *Parker*. And the opinion will be found fully sustained by the reasons assigned for it.

*Curia*, per SAVAGE, Ch. J. The contract in this valued policy is, " that the goods shall come safe to the port of delivery ; or, if they do not, to indemnify the plaintiff to the amount of the prime cost, or value in the policy." (2 *Burr.* 1172, *per Ld. Mansfield.*) The valuation is admitted in the policy : it is the amount to be recovered, if the property insured is lost by the perils insured against. (*Philips on Ins.* 307. 3 *Taunt.* 506. 6 *Cranch*, 220-1. 3 *Caines' Rep.* 20. 3 *T. R.* 362.) And this value is conclusive upon the underwriters, when there is no suggestion of fraud or imposition. (*id.* 8 *John. Rep.* 234. 2 *East*, 109. 2 *Campb.* 69.) There is no question, in this case, that the whole quantity of wine insured was on board during the outward voyage ; and an amount beyond its avails was invested in the return cargo. The exception, therefore, established by *Forbes* v. *Aspinall,* (13 *East*, 323) where part, only, of the goods insured are on board, at the time of the loss, does not apply.

Had the wines themselves been lost on the outward voyage, there could be no doubt as to the amount of the recovery ; but the loss was of the return cargo. The insurance being upon the wine out, and *returns* home, valued at $14,000, the remaining question, and the principal one made at the bar is, whether the goods lost *were* the *returns* of the wine? Had the wine been sold for $7,000, and the return cargo purchased with the avails, there is no doubt the defendants would have been liable under the authorities cited, for the whole $14,000. Now, whether the money was paid by *Loesman*, on a sale of the wines, or advanced on a pledge of them, makes no sort of difference to the defendants ; though it would be otherwise, if the advance had been less than the value of the wine—one half, for instance. In such a case, if the plaintiff were permitted to recover to the extent of the valuation, he would compel the defendants to pay for the whole of his wine, and yet would have the one half safe at *Batavia*. It should appear, therefore, that

UTICA,
Aug. 1824.

Jackson
v.
Allen.

the whole proceeds of the wine were invested in the goods lost. The policy then attaches for the whole, though it may be more than a mere indemnity. (*Havens* v. *Gray*, 12 *Mass. Rep.* 76.)

Although when the $7,000 were advanced, the wine was supposed to be worth more than $10,000, yet the actual sales were subsequently made for less than $4,000. The whole proceeds, therefore, or *returns* of the wine, and more, were invested in the goods lost. I cannot consider the $8,621, advanced by *Loesman*, as loaned upon the plaintiff's personal credit. *Loesman* advanced the money upon the deposit of the wine, and that was all the security he took; no doubt, supposing it amply sufficient to indemnify him, and something beyond, as we find provision made in the receipt for a remittance of the balance. Subsequent events have shewn, however, that the advance exceeded the whole proceeds.

I am, therefore, of opinion, that the plaintiff is entitled to recover the $14,000, and interest.

*Judgment accordingly.*