(51 App. Div. 553.)

### VOISIN v. PROVIDENCE WASHINGTON INS. CO.

(Supreme Court, Appellate Division, First Department.   May 25, 1900.)

1. MARINE INSURANCE—SEAWORTHINESS.

A vessel whose cargo was insured was without metal sheathing of any kind.   It remained in the Gulf of Mexico four months before sailing for New York.   On its way to New York it was caught in a storm, and wrecked and abandoned, and when picked up shortly afterwards it was found badly worm-eaten.   The vessel was in a seaworthy condition prior to its arrival in the Gulf of Mexico.   A leak sprung in the vessel just previous to its abandonment was not shown to be due to its worm-eaten condition.   It was still afloat when taken up about two weeks after it was abandoned.   There was evidence that a vessel badly worm-eaten is not necessarily unseaworthy.   Held, that the question as to whether the vessel was seaworthy at the commencement of its voyage is for the jury.

2. SAME—DEFENSES—CONSPIRACY.

The consignee of a cargo of goods assigned the bills of lading to another, who undertook to pay a large sum of money therefor.   The assignee of the bills insured the goods, taking out a valued policy.   It afterwards appeared that the bills were drawn for from 50 to 60 per cent. more than was actually shipped, which the evidence tended to show was the result of a conspiracy between the captain of the vessel and the one who chartered it to obtain bills of lading for a larger amount than was loaded on the ship, and then lose it, and thus defraud insurance companies.   The assignee of the bills had no knowledge of the conspiracy when he obtained the insurance, but acted in good faith.   It is not shown that the consignor of the goods was in any way connected with the conspiracy.   Held, that the insurance was valid to the extent that goods were actually shipped, and that the insured was entitled to recover the proportion of the

sum insured that the goods shipped bore to the goods described in the
bills of lading.

3. SAME—BURDEN OF PROOF.
Where it is shown in an action on a valued insurance policy that goods
of the general description of those contained in plaintiff's bills of lading
were actually on the vessel lost by a peril insured against, the burden
is on the insurance company to show that all the goods on which the
valuation stated in the policy was based were not actually shipped.

4. STIPULATION—CONSTRUCTION—OBJECTIONS TO EVIDENCE.
Under a stipulation between plaintiff and defendant that on trial of
any of the actions specified therein testimony given on behalf of de-
fendant in either of the preceding trials of the actions may be read on
subsequent trial of the case, "subject, however, to the same legal objec-
tions and exceptions as if the witness were in fact produced upon such
trial," the plaintiff may object to a deposition used on the former trial,
although the objection was not made when the deposition was taken, not-
withstanding a previous stipulation that "no new nor additional objections
or exceptions to be made or taken."

Appeal from trial term, New York county.

Action by Stevens Voisin against the Providence Washington In-
surance Company. From a judgment for defendant and an order de-
nying a new trial, plaintiff appeals. Reversed.

Argued before VAN BRUNT, P. J., and RUMSEY, McLAUGHLIN,
and INGRAHAM, JJ.

William Mitchell, for appellant.
Tredwell Cleveland, for respondent.

INGRAHAM, J. The action is brought to recover on a policy of
marine insurance whereby the defendant insured the plaintiff "for ac-
count of himself, loss, if any, payable to him to be insured, lost or not
lost, seventy-five hundred dollars, on merchandise valued at $29,500 on
board bark L. E. Cann, at and from Tecolutla to New York." The
perils insured against were "of the seas, fire, barratry of the master
and of the mariners, and all other sea perils and misfortunes which
have or shall come to the damage of the said cargo, and [or] freight
of any part thereof to which insurers are liable by the rules and cus-
toms of insurance in Boston," and for which the plaintiff paid to the
defendant the sum of $180 as a premium. This policy was dated March
10, 1882. The bark L. E. Cann took on a portion of her cargo at Vera
Cruz, and then sailed for Tecolutla, where she took an additional
cargo, leaving Tecolutla in the last of March, bound for New York.
After leaving the Gulf of Mexico, and out in the Atlantic Ocean, she en-
countered some rough weather, when the vessel sprung aleak, and was
abandoned on the 27th day of April, 1882. One William Brooks was
master of this vessel, and he issued two bills of lading to Hoffman
Hermanos, which admitted the receipt of 1,340 packages of goods
consigned to one L. Contanseau at New York. These bills of lading
were assigned by indorsement of Contanseau, and were delivered to
the plaintiff under a written agreement which recited that Hoffman &
Hermanos, at Vera Cruz, were indebted to Contanseau in the sum of
$11,424.22, and that the plaintiff was desirous of paying the said in-
debtedness, and it was agreed that the plaintiff would accept certain
drafts already accepted by the said Contanseau aggregating $5,077.65,

would pay a certain claim due and owing from said Contanseau to one Francois to the amount of $3,444.44, and would pay for certain goods consigned to Contanseau amounting to the sum of $3,068.64; and in consideration of this obligation the said Contanseau agreed to transfer, assign, and set over to the plaintiff the two bills of lading described, and thereupon Contanseau indorsed the bills of lading and delivered them to the plaintiff. This agreement was made the 13th of February, 1882, and subsequent to the transfer of these bills of lading to the plaintiff the policy of insurance upon which this claim was based was applied for and obtained from the defendant, and the premium was paid thereon. It also appeared that this bark was abandoned about 180 miles from Charleston, S. C., on the 27th of April; that in the following June she was discovered still afloat in the Atlantic Ocean, and was towed by two tugs to Norfolk, Va. At the time she was discovered she was barely afloat, the cargo being submerged. All her masts were gone, and the central part of the deck in the vicinity of the main-mast was torn out, for a distance of 25 to 30 feet, the whole width of the vessel. All her spars and some of the deck beams were gone. There were also found 18 or 19 auger holes in the vessel below the water line. The vessel was taken to Norfolk, where the cargo left in her was removed, and she was afterwards sold and repaired. The captain of the vessel was called by the defendant, and testified that he arrived at Vera Cruz in November, 1881; that afterwards, and on the 6th day of January, 1882, he made a charter with one Granes to load the vessel at Vera Cruz and Tecolutla for New York; that Granes was introduced to him by one Campos, who seems to have been a ship broker; that this charter was made under an agreement between Granes, through Campos, and the captain, by which a bogus cargo was to be shipped for New York, and the vessel was to be sunk at sea and abandoned, and for this the witness was to be paid $6,500,—$500 on signing the charter, $2,000 on signing the bills of lading at Vera Cruz, $2,000 on signing the bills of lading at Tecolutla, and $2,000 at delivery of protest for the loss of the vessel; that, in pursuance of this understanding, a portion of the cargo was put aboard the vessel at Vera Cruz (the witness stating the amount of the different kinds of cargo that was actually put aboard, and which appeared upon the mate's receipt as the cargo that was actually received), and that he gave bills of lading which called for from 50 to 60 per cent. more than had actually been placed on board; that the Vera Cruz bills of lading were signed on the 24th of January, and some three or four days after that the vessel left Vera Cruz for Tecolutla, where some additional cargo was taken on board, for which bills of lading were given to Granes. What was received there was fustic, a dye wood, and some packages said to contain coffee and vanilla beans. This witness then testified that after he got to Tecolutla he took out a part of the ballast which had been put aboard the vessel at Vera Cruz, because he had then made up his mind to bring the vessel to New York; that the vessel then started for New York; that they had good weather up through the Gulf, but after they got through the straits of Florida they had some rough weather from the northeast, when the ship commenced to leak, and finally she leaked so bad that she could not be kept free

of water, commenced to list over, and then she was abandoned; that she was then about 180 miles from Charleston, S. C.; that after he determined to abandon the vessel he bored auger holes in her so as to sink her; that he did so to get her out of the way of other vessels; that shortly afterwards he was picked up by a schooner, and taken to Philadelphia.

Notwithstanding this witness' alleged change of intention as to scuttling the vessel, he demanded and received the price of his crime. Upon his cross-examination he was asked to name the conspirators of this scheme, and he said there were himself, Campos, Granes, and Joublanc. They were all he was acquainted with. There was thus no direct evidence to connect Hoffman with this conspiracy, although Campos, who was the go-between for the captain and Granes, was his brother-in-law.

The court left it to the jury to say whether such a conspiracy did exist, and charged the jury that it was incumbent upon the defendant to satisfy the jury that Hoffman knew of it, was a party to it, and acted upon it; but if they believed that "there was a fraudulent conspiracy, that Hoffman was a party to it, through Campos, Granes, and the other witnesses, who have been placed upon the stand, and the captain, Brooks, it will be your duty to say so, and in that event it will be your duty to render a verdict for the defendant"; and, further, that "if you believe that this fraudulent conspiracy has been made out, or if you believe that the vessel was unseaworthy at the time she left upon her voyage, or that she was not lost by reason of any willful or wrongful act of the master, then you will find a verdict in favor of the defendant." Counsel for the defendant excepted to such parts of the charge as said that the plaintiff could not recover pro tanto for such as was in fact on board. To that the court answered: "Not if there was fraud; not if Hoffman was a party to the fraud." The court then added: "If you find there was no fraud here, and if you find there was a large overvaluation of the property, you may find, if you regard Hoffman and the plaintiff both as innocent, that the plaintiff is entitled to recover such portion of the cargo described in the policy as the evidence has shown to have been on board." Counsel for the plaintiff then asked the court to charge: "If the jury find Hoffman guilty of fraud in shipping substantially less goods than those named in the bills of lading, Hoffman could not recover, and plaintiff cannot recover for Hoffman the alleged interest of $10,000, or any part of $10,000, and plaintiff's recovery in that case would be restricted to an amount not exceeding 195–295ths of the plaintiff's claim herein." And counsel also requested the court to charge that "the bona fide interest of the plaintiff in this shipment is not to be dismissed or destroyed by Hoffman's fraud, if any." The court refused to charge these requests, and the plaintiff excepted.

The jury having found a verdict for the defendant, the defendant claims that upon the evidence it was entitled to the direction of a verdict that the vessel was not seaworthy at the commencement of the voyage. We think this question was properly one for the jury. The evidence upon which the defendant bases its claim that the vessel was not seaworthy is that the vessel, without metal sheathing of any kind,

arrived in the Gulf of Mexico about the latter part of November, 1881, and remained at Vera Cruz and Tecolutla until March, 1882, before sailing for New York; that when she was picked up and towed into Norfolk she was found badly worm-eaten; and evidence was offered tending to show that unprotected wood in the waters upon the shore of the Gulf of Mexico is subject to be attacked by the worms, and that from the condition in which the vessel was found at Norfolk it must be assumed that this worm-eaten condition of the vessel was occasioned during her stay in the Gulf of Mexico. There was evidence tending to show that the vessel was in a seaworthy condition at Cardiff, England, prior to her voyage to Vera Cruz; that she sprung aleak on that voyage, which was repaired, and when she arrived at Vera Cruz she seemed to be in a reasonably safe condition; that the leaking did not increase during her stay in the Gulf of Mexico; that when she left Vera Cruz she did not leak any more than she had prior to that time; that although she sprung aleak after a storm in the Atlantic Ocean, and was abandoned by the crew, the evidence does not connect that leak directly with the worm-eaten condition of the vessel; and the fact that although abandoned and floating around in the ocean for weeks without any care she still floated, and was towed into Norfolk, certainly renders it probable that if the crew had stayed by and cared for her she could have successfully accomplished her voyage. There is also evidence to show that vessels badly worm-eaten are not necessarily unseaworthy, one of the witnesses called by the defendant upon this subject testifying that, although a vessel which he had commanded was badly worm-eaten in the Gulf, she continued in use for a year and a half after before being repaired, and that the vessel was apparently perfectly seaworthy during that time. Upon all the testimony, we think that it was a question for the jury to say whether or not the vessel was seaworthy, and that the defendant was not entitled to the direction of a verdict on that ground.

The next question which has to be met and answered is as to just what effect this conspiracy between the captain and the person who chartered the vessel would have upon the right of the plaintiff to recover in this action. It is claimed that there is no evidence to show that Hoffman was directly connected with this conspiracy. While it is quite true that in proving fraud of this kind it is not necessary to show direct participation in the fraudulent scheme or device, still fraud must be proved by competent legal evidence from which that inference can be fairly drawn. In the view, however, that we take of the other question presented, this becomes of no importance.

We are then brought to the question as to whether or not the plaintiff, to whom the goods shipped by Hoffman had been transferred, was prevented from recovering upon this policy of insurance. There can be no doubt but that Hoffman actually placed a portion of these goods and merchandise upon this vessel to be shipped to New York; and, while the evidence is not very clear as to just what he did ship, the testimony of the captain read by the defendant is at least some evidence to show that part of the goods mentioned in these bills of lading was actually shipped, but that what was actually shipped was increased by the bills of lading from 50 to 60 per cent. It would also

65 N.Y.S.—22

seem to follow that Hoffman's title to the goods that were actually shipped was transferred by the indorsement upon the bills of lading to the plaintiff, who became the legal owner thereof; and so far as appears he received them in good faith, without knowledge of any fraud or conspiracy, and that he was actually defrauded into receiving and paying for goods said to be loaded upon this vessel which in fact were never placed there. By the transfer of the bills of lading he became the owner of the goods which were actually upon the vessel. If the vessel had safely arrived in New York there would not, I think, be any doubt but that the plaintiff would be entitled to the goods which were actually shipped. The conspiracy to obtain bills of lading for a larger amount of goods than was loaded upon the vessel, and then to lose the vessel, so that the insurance companies would be defrauded, would not affect this plaintiff, if, acting in good faith, he had bought the supposed cargo. Being thus the owner of the goods actually shipped, he certainly was entitled to insure his interest in those goods, and the contract made between the defendant and the plaintiff for that purpose was a valid contract, based, it is true, upon a mistake of the parties as to the amount of goods actually shipped, but certainly valid to the extent that goods were actually shipped; and to the proportion of the sum insured that the goods shipped bore to the goods described in the bills of lading I can see no reason why this plaintiff was not entitled to recover.

It is a general rule that one person is not responsible for the fraud of a third person, unless he in some way participates in the fraud, or unless he is responsible therefor on some principle of the law of agency. In Brackett v. Griswold, 112 N. Y. 467, 20 N. E. 379, it is said: "It is not necessary that the false representation should have been made by the defendant personally. If he authorized and caused it to be made, it is the same as though he made it himself. Nor is it necessary that it should have been made directly to the plaintiff. If it was made to the public at large, for the purpose of influencing the action of any individual who may act upon it, any person so acting upon it and sustaining injury thereby may maintain an action." And the same rule applies to the avoidance of contracts and conveyances. Thus, the general rule is stated in 14 Am. & Eng. Enc. Law (2d Ed.) p. 154: "Nor, as a general rule, can a contract or conveyance be avoided by one of the parties thereto because of the fraud of a third person, unless the other party participated in the fraud, or knew of it, or unless he is responsible for the other's act on the ground of agency,"—and the cases cited in the note sustain the rule stated. See, also, Insurance Co. v. Ruggles, 12 Wheat. 416, 6 L. Ed. 674. And in Alsop v. Insurance Co., 1 Sumn. 470, Fed. Cas. No. 262, Judge Story says: "But if the policy is procured in entire good faith, if there is no intent to deceive, and if there is a substantial interest, then the variation, whatever it may be, is unimportant."

Assuming that Hoffman was connected with this conspiracy, what is there to connect this plaintiff with it, or with any of those who were engaged in it? The plaintiff did not receive the goods directly from Hoffman, and, so far as appears, he had no communication with him in relation to them. The plaintiff was engaged in business in New

York, and, so far as appears, was conducting a legitimate business. He had received consignments of goods from Hoffman prior to this time, and had had business relations with him. But these goods were not consigned to the plaintiff, but to another; and from such other person the plaintiff received the bills of lading which operated as a transfer of the title to the goods upon the ship, and upon such transfer he actually advanced, or agreed to advance, a large sum of money. That this transfer of the bills of lading was sufficient to transfer to the plaintiff a title to the goods represented by them, which were actually shipped, must be conceded. The plaintiff, thus being the owner of these goods, clearly had a right to insure them, and that the defendant undertook to do by the policy in question. It received the premium paid by the plaintiff as the consideration for its contract to indemnify the plaintiff for any loss sustained by the perils insured against, and I can see no principle upon which this plaintiff (unless he was a party to the conspiracy, or had knowledge of it prior to the time when the policy was issued) would be prevented from enforcing this contract for his own protection because of the fraud of these conspirators in Mexico, with whom he had no relation, and for whose acts he was not responsible. This principle has been applied many times, and has lately been applied in this court in the case of a fraud practiced upon a surety by the principal, to which the beneficiaries were not parties, and it was held that, as the fraud was in no way imputable to the beneficiaries, it could not operate to invalidate the bond. Rothschild v. Frank, 14 App. Div. 400, 43 N. Y. Supp. 951.

Assuming, therefore, that the plaintiff, not being in any way responsible for the fraud committed in Mexico, was not affected by it, the question is then presented as to what he would be entitled to recover under the policy in question. This was a valued policy, and undoubtedly the rule is well settled that the value of the goods stated in a valued policy is, in the absence of fraud, conclusive between the parties, however largely in excess of the true value. That principle was settled by Lord Mansfield in the case of Lewis v. Rucker, 2 Burrows, 1167, and is recognized to be the settled rule in the case of Barker v. Janson, L. R. 3 C. P. 303, and seems to have been universally followed in this country. Thus, in Alsop v. Insurance Co., 1 Sumn. 451, Fed. Cas. No. 262, Judge Story says: "I do not know that any overvaluation, however great, if it steers wide of a wager and a fraud, can be otherwise impeached." See, also, Whitney v. Insurance Co., 3 Cow. 210. There is, however, another principle which has been applied, and which is very clearly stated by Lord Ellenborough in Forbes v. Aspinall, 13 East, 323. There it is said:

"The valuation, however, in the case of goods, looks to all the goods intended to be loaded; and in the case of freight it looks to freight upon all the goods the ship intended to carry upon the voyage insured; and if, by the perils insured in a valued policy on goods, part only of the goods intended to be covered be lost, the valuation must be opened, and the insurer can only recover in respect of that part. * * * If, for instance, the insurance be generally upon goods, and the goods intended to be protected be 500 hogsheads of sugar, and a valuation be made accordingly, but the ship by accident takes on board 100 only, and sails, and is afterwards lost by one of the perils insured against, with those 100 on board, can it be contended that the assured shall recover to the full amount of the valuation,—that is, for the whole 500,

—when he has lost only one hundred? \* \* \* The proposition is monstrous. Instead of confining the policy, as it ought to be confined, to a contract as nearly as may be of indemnity against what may be lost in respect of freight by the perils insured against, it converts it into a contract of indemnity against a different class of accidents, which may operate to prevent the assured from being able to procure a full cargo upon freight, and may make it the interest of the assured, which it never ought to be, that a loss should happen. The court, therefore, will look for very strong authorities before they yield to such a proposition. It was pressed upon the argument that, in the case of valued policy, if any interest be proved to be on board, and there be no fraud, a total loss will entitle the assured to recover the sum specified in the valuation. And to that position we accede, with this limitation: that is, provided there is a total loss, by any of the perils insured against, of the whole subject-matter of insurance to which the valuation applied, viz. of all the intended cargo of goods, where the insurance was on goods, and of all the intended freight, where the insurance was upon freight. But if he meant to carry that position to this extent, that the underwriter is not at liberty to inquire what was intended to have been included in the valuation, or, when he has ascertained that point, that he cannot reduce the sum below the valuation, by proving that a part only of what was included in the valuation has been lost by a peril insured against, we deny the position when so extended."

And the same principle was applied in Tobin v. Harford, 13 C. B. (N. S.) 791, where Blackburn, J., says:

"The question in all cases is, what is the subject-matter that is covered by the insurance? Let us see whether the whole of the subject-matter is lost, in which case it would be a total loss, or whether only a part is lost, in which case it would be a partial loss, the amount of which would depend on the proportion which the part that was lost bore to the subject-matter of the insurance. Then, if that is a valued policy, the value being admitted, the sum, when reduced to figures, is proved."

This principle has also been accepted in this country. Insurance Co. v. Lunar, 1 Sandf. Ch. 91, was a bill for a discovery in aid of the defense in an action at law upon a policy of insurance. The complainants charged in the bill that the claim under the policy was fictitious and fraudulent; that the defendant never possessed any such specie, or but a small portion of it. The assistant vice chancellor said:

"The claim being upon a valued policy, it is only necessary for the defendant to prove at law a substantial interest in a subject corresponding to and satisfying the description in the policy. It is not incumbent on him to prove that the whole property was shipped, or that he was the owner of the whole. On the other hand, the insurers may show that, either by mistake or design, the whole of the property insured was not put on board, or, if it were, that the claimant had an interest in only a part of it, and thus entitle themselves to a proportionate reduction of their liability on the policy."

Applying these principles, it would appear that upon the trial of this case there was to be determined the proportion of the goods covered by the valuation in the policy that was actually shipped, and that the plaintiff would be entitled to recover that proportion of the value that the parties had placed upon the whole shipment. Thus, if it should be found that the captain gave bills of lading for 50 or 60 per cent. in addition to the amount that was actually placed upon the ship, the plaintiff would be entitled to recover that percentage of the amount of $7,500 for which this policy was given. This seems to be the principle applied in the case of The Main [1894] Prob. Div. 320, where Mr. Justice Gorell Barnes, after determining the principle, says:

"The subordinate question in the case is what amount the plaintiffs are entitled to recover. A sum of £952. 3s. 9d. was paid in respect of freight before the ship sailed. It was paid, according to the admission of the parties, on the shipment of the goods to which the policy related, and therefore that sum never came at risk upon the policy. The result is that that sum, out of the sum of £3,250. 7s., was not at risk, and therefore the valuation of £5,500 must be reduced in proportion to the rule of three sum arrived at by the relationship of £952 to £3,250."

In this view of the right of the plaintiff to recover, which is quite different from that adopted by the learned trial judge, it is hardly necessary to discuss the rulings upon evidence. If, however, this plaintiff is not affected by the conspiracy of the parties in Mexico, it is quite evident that as to him the declarations of the co-conspirators would not be admissible. The main question to be determined would be as to the goods that were actually shipped upon the vessel. Upon proof that goods of the general description of those contained in the bills of lading belonging to the plaintiff were actually upon the vessel, and that the vessel was lost by perils insured against, the burden would be upon the defendant of showing that all of the goods upon which the valuation stated in the policy was based were not actually shipped; and, if it established to the satisfaction of the jury that a certain proportion of such goods was not actually shipped, the amount for which the plaintiff should be allowed to recover would be reduced in the proportion above indicated. In this connection it is well to call attention to a portion of the testimony of Hoffman upon his cross-examination, when he was asked: "Are you not interested in the result of this litigation? If so, state the amount of your pecuniary interest therein. A. Yes; I am interested in the result of this litigation for the sum of about ten thousand dollars." The effect of that fact upon the recovery need not be determined upon this appeal. Of course, there could be no recovery against this defendant for the benefit of Hoffman if he was a party to the conspiracy. If this answer was based upon the idea of the witness that, if a total recovery was allowed upon this policy of insurance, after paying the advances made by the plaintiff this amount would be coming to him, the plaintiff's recovery would be limited to an amount sufficient to repay him such advances. No explanation was given of this testimony of Hoffman, and upon a retrial evidence may be given which will satisfactorily show upon just what basis this answer was predicated, and just what interest, if any, Hoffman still retains in this shipment.

The other questions, as to the admission and rejection of evidence, it is not necessary to discuss. The case was submitted to the jury upon the theory that, if Hoffman was engaged in this conspiracy, the plaintiff could not recover; and to the submission of the case to the jury upon that theory the plaintiff excepted, and for that reason a new trial must be ordered. There is one ruling, however, which will be important upon a new trial, and that is as to the effect of the stipulation dated December 18, 1889, as to the testimony of Brooks, the captain of the vessel. Under that stipulation it is agreed that the testimony of Brooks shall be read in this action, "no new or additional objections or exceptions to be made or taken, subject to motion to strike out." Upon that stipulation counsel for the defendant objected

to the plaintiff's taking any objection to Brooks' deposition which was not taken at the time the deposition was taken. We think, however, that this stipulation was superseded by the stipulation of October 9, 1894, by which it is agreed that upon any trial of any one of the actions specified in the stipulation any of the testimony given on behalf of the defendant on either of the preceding trials of the action against the Commercial Mutual Insurance Company may be read on any subsequent trial of the said case against the Commercial Mutual Insurance Company, with the same force and effect as if the witnesses were produced and testified upon such trial, "subject, however, to the same legal objections and exceptions as if the witnesses were in fact produced upon such trial," and that under this last stipulation the plaintiff was entitled to take objections to the testimony to the same effect as if the witness had been upon examination.

Without expressing any opinion as to the other questions argued, for the reasons above stated the judgment and order appealed from must be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.