That right, it seems to me, is entirely inconsistent with the existence of any lien upon future products or earnings by the mortgagee. The latter could not have a lien upon such earnings or products while the mortgagor was permitted to use them for the conduct of its business and the payment of its current debts."

In Gilman v. Telegraph Co., 91 U. S. 603, 23 L. Ed. 405, the mortgage covered "all rents, issues, income, tolls, profits, currency, moneys," etc.; but the court said (page 617, 91 U. S., page 410, 23 L. Ed.):

"It is clearly implied in these mortgages that the railroad company should have possession and receive the earnings until the mortgagees should take possession, or the proper judicial authority should interpose. Possession draws after it the right to receive and apply the income. Without this the road could not be operated, and no profit could be made. Mere possession would have been useless to all concerned. The right to apply enough of the income to operate the road will not be questioned. The amount to be so applied was within the discretion of the company. The same discretion extended to the surplus. It was for the company to decide what should be done with it. In this condition of things the whole fund belonged to the company, and was subject to its control. It was, therefore, liable to the creditors of the company as if the mortgages did not exist. They in no wise affected it."

Enough has been said to indicate that the other points urged by the respondents, to the effect that the permanent receiver is barred by laches, or bound by the former adjudications herein, are unavailing. He should have the money and the books. He is entitled to an adjudication that so much of the order appointing Nelson receiver as purported to appoint him receiver of the railroad company, and of its moneys, rents, profits, and income due and accrued to the company at the time of his appointment, is null and void. The denial at the special term of his application for a modification of the foreclosure judgment in declaration of the limitation of the mortgage lien may be upheld without prejudice to further proceedings on due notice to all concerned, if the permanent receiver be so advised; and the relief granted on this appeal should be with $10 costs and disbursements. All concur.

(64 App. Div. 182.)

BUFFALO ELEVATING CO. v. PRUSSIAN NAT. INS. CO.

(Supreme Court, Appellate Division, Fourth Department. July 23, 1901.)

1. INSURANCE—USE AND OCCUPANCY—DAMAGE—FIXED SUM—INDEMNITY.
    Defendant issued its policy on the "use and occupancy" of plaintiff's elevator, providing that, if it should be destroyed, or so damaged as to prevent the elevating and handling of grain, defendant should be liable at the rate of $4.77 for each working day of such prevention. *Held*, that defendant's liability did not depend on the question whether the use of the elevator was profitable or otherwise.

2. SAME—POOLING EARNINGS.
    Defendant's policy on the use and occupancy of plaintiff's elevator provided that the policy should be void if the insured had concealed or misrepresented any material fact, or if his interest was not truly stated. Plaintiff, with proprietors of other elevators, had entered into an agreement, of which defendant was not informed, by which all receipts after paying operating expenses were pooled, and divided pro rata. *Held*, that such agreement was not a violation of the policy.

3. SAME.
    Plaintiff and other elevator owners agreed to pool their earnings, and provided that destruction by fire should not deprive the owner of an

elevator of his share of the earnings. Defendant issued its policy on the use and occupancy of plaintiff's elevator in a specified sum per day during disability. The elevator was damaged by fire, and plaintiff received from the pool its share of the earnings of the other elevators. *Held* such receipt did not affect defendant's liability under its policy, since its contract was not one of indemnity.

Appeal from trial term, Erie county.

Action by the Buffalo Elevating Company against the Prussian National Insurance Company. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Affirmed.

The plaintiff is a domestic business corporation owning a grain elevator in the city of Buffalo. The defendant is a foreign insurance company, organized pursuant to the laws of the empire of Germany, and duly authorized to carry on the business of fire insurance within the state of New York. This action was commenced December 19, 1900, on a policy of fire insurance issued by the defendant to the plaintiff March 10, 1900, and operative for the period of one year from that date. The facts were stipulated upon the trial.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and RUMSEY, JJ.

George Richards, for appellant.
Tracy C. Becker, for respondent.

SPRING, J. The plaintiff owned an elevator building situate on Blackwell Canal and Hatch Slip in the city of Buffalo, and known as the "Dakota Elevator." The defendant issued its policy on the "use and occupancy" of this property. The premium paid was $26.25, and the insurance was not to exceed $1,500. The contract of insurance contained the condition that, if "the property, buildings, or machinery therein, or either of them, or any part thereof, shall be destroyed, or so damaged as to prevent the elevating and other handling of grain, this company shall be liable at the rate of $4.77 per day for each working day of such prevention." It was further provided that the loss was to be computed from the date of the fire "to the time when the buildings could, with ordinary diligence and despatch, be repaired and rebuilt, and machinery placed therein; and not to be limited by the day of expiration named in this policy." On the 13th of August, 1900, the elevator, with its contents, was destroyed or damaged by fire. Appraisers were appointed, in compliance with the terms of the policy, to ascertain the length of time which plaintiff would be prevented from carrying on its business, and awarded in their report 259 days. There were many policies of other companies of similar insurance, and the aggregate liability, as adjusted by these appraisers, was $60,328.87, and the proportion thereof chargeable to the defendant is $1,235.41. At the time of the issuance of the policy, and also at the time of the loss, the plaintiff, with about 20 other elevating companies in Buffalo, and comprising a majority of them in that city, had formed a combination known as the "Western Elevating Association." The business of this association was managed by an executive committee, chosen by the members composing it. All receipts of money for business carried on by the members of the organization were collected by its treasurer, and, after paying the expenses of the combination, and certain prescribed charges to the elevator company.

earning them, the earnings were to be distributed among the various companies in certain percentages, set forth in the combination agreement. This agreement was operative substantially during the period of lake navigation, and was intended to regulate the rate of elevator charges, which were fixed by said committee, and to facilitate the carrying on of the business of handling and transshipping grain. The plaintiff, during the existence of this agreement, was not restricted in the operation of its plant, and that is true of each representative in the organization. The plaintiff owned its plant and machinery and all the elevator property, carried on its business, employed and paid and controlled its workmen, made its own contracts for the shipping and handling of the grain, and paid its own current and operating expenses, taxes, and insurance, and managed its affairs the same as theretofore; but turned over 80 per cent. of its elevator receipts into the association, to be distributed as their agreement directed. It was like a clearing house for the banks of a city represented in it. Each bank retains control of its affairs, but the clearing house committee supervises it, and, in a measure, regulates the business in a general way of all the banks who are interested in the clearing house. The course of business required that, whenever any grain arrived at the port of Buffalo consigned to any of the elevator companies in the association, the consignee at once reported the fact to the secretary and treasurer of the association, and its warehouse receipt was issued to the company receiving the grain; and a like course was pursued when grain was shipped out of the said elevator. The defendant presents several defenses to the collection of the amount fixed by the appraisers as its proportionate share of the loss to the plaintiff. By the terms of the policy it is rendered void if the insured "has concealed or misrepresented * * * any material fact or circumstance concerning this insurance, or the subject thereof, or if the interest of the insured in the property be not truly stated herein." And it is further provided that the policy shall be void "if the interest of the insured be other than unconditional and sole ownership; or if the subject of insurance be a building not owned by the insured in fee simple." It will be noted that the policy does not insure the buildings of the plaintiff, but the "use and occupancy" of this property. The keynote of the argument of the learned counsel for the appellant is that "use and occupancy" signifies "expected profits of estimated earnings," and it is claimed the plaintiff was not the unconditional and sole owner of these earnings; consequently, a material representation in the policy has been violated. We cannot agree with this contention. There is no suggestion in the policy that "use and occupancy" is correlative with "earnings," or affects them in any way. The insurer agreed to pay absolutely and unconditionally the sum which it fixed in its contract for the loss to the plaintiff by reason of the suspension of its business by fire. That sum was in no way dependent upon the profits which were accruing to the plaintiff for the loss it may have been suffering at the time the fire took place. Whether the plant was in operation or idle, whether remunerative or not, was of no concern to the defendant. The liability to pay was fixed irrespective of whether the insured lost or gained by the fact

that the elevator might not have been running during the time of the rebuilding, even if no fire had occurred.  If the business was interrupted by fire in any part, the liability continues during the time required to restore the plant to its former condition.  On what the defendant bases its per diem allowance does not appear.  The evidence does not show that it exacted a statement to be furnished, preliminary to the issuance of the policy, of the past or prospective earnings of the plaintiff.  The insurer was responsible for the rate fixed; and, whether founded on earnings, or some other grounds, or a mythical basis, is a matter of conjecture.  "Use and occupancy" may refer to market rental value, to the earnings, to the occupant, or to the extent of the business carried on, though it does not inure in profit to the user.  During depressed times the business might be extensive and unprofitable, while at other times the net income might be large in proportion to the business done.  The amount of the earnings would inevitably be varying and uncertain from month to month, or from year to year; but the amount defendant has stipulated to pay when loss by fire occurs is unchangeable.  It is entirely immaterial to the insurer what disposition the plaintiff makes of its earnings, if any there be.  If it desires to give them away, or assign them, or unite them with other like concerns in a common fund for their weal or woe, that agreement does not need the sanction of the defendant to keep alive the policy.  It is interested in the occupancy of the plant by the plaintiff, but the use made of its earnings is of no more moment to the defendant than what is paid to the foreman or any of the employés in the elevator building.  The insured did carry on its business.  It did retain unimpaired its title to the property.  Whatever gives significance to the expression "use and occupancy," as intended in this policy, it continued to be burdened or benefited with.  That expression did not contemplate invalidating the policy because the number of men employed in the business happened to be increased or diminished, or because the amount of the business may have been augmented, or because the elevator was run to full capacity or only occasionally.  The vitality of the policy in no way hinged upon the manner in which the property was managed.  If the plaintiff parted with the user, if it transferred the occupancy to another, then the insurer might be heard to complain.

The authorities cited by the learned counsel for the appellant do not hold that the expression "use and occupancy" in a policy implies profits or earnings.   In Wright v. Pole, 1 Adol. & E. 621, the insured, whose property, which was an inn, had been burned, sought to recover for loss sustained by him by persons refusing to patronize him while it was undergoing repairs.   The court held that these damages were not covered by the policy; that, while profits could be made the subject-matter of insurance, "he must insure qua profits."   In Niblo v. Insurance Co., 1 Sandf. 551, the court also held that profits represented an insurable interest, "but they must be insured as such."   In Abbott v. Sebor, 3 Johns. Cas. 39, 2 Am. Dec. 139, the court decided that a person interested in the subject-matter from which the profits are derived may insure those profits.   In these

cases it will be observed the court simply holds that profits may be the subject-matter of insurance, but, in order to be covered, they must be included specifically in the policy. The cases proceed upon the assumption that the policy determines what is insured, and nothing will be read into the policy to relieve the insurer from the strict performance of the agreement, or to add to the burdens it has undertaken to meet. It is undoubtedly true, as urged by the counsel for the appellant, that the essence of an ordinary fire insurance policy is indemnity against loss. There is this in the present policy, however, that distinguishes it from the ordinary open policy. The sum stipulated in that contract may be subject to diminution for various causes. This policy is analogous to the so-called "valued policy." The sum to be paid is fixed by the insurer, and is not subject to variation. The insurer is to pay $4.77 per day during the time the plaintiff is prevented from doing business by reason of the fire loss, and that is not made dependent on whether the insured is carrying on a profitable business. It may have had unfortunate contracts, which were terminable by the fire, so that the suspension of business would be to the pecuniary benefit of the plaintiff. Still the defendant must pay the stipulated sum. Interruption of business, when the insured is to be paid in the meantime, may often be gainful to him; but that is no reason why the insurer should evade payment. The weekly indemnity paid to an injured person who is insured by an accident company may exceed what he has been earning when in full health; but it has agreed to pay a certain sum for the specific disability inflicted, and that is the measure of its liability. In construing a valued policy, the court in Voisin v. Insurance Co., 51 App. Div. 553, 65 N. Y. Supp. 333, use this language at page 560, 51 App. Div., and page 339, 65 N. Y. Supp.:

"This was a valued policy, and undoubtedly the rule is well settled that the value of the goods stated in a valued policy is, in the absence of fraud, conclusive between the parties, however largely in excess of the true value."

Wood, in his work on Fire Insurance, thus states the principle in section 43:

"When a valuation is made by the insurer, he is, in the absence of fraud, estopped from disputing it, and is liable for the value fixed, although the real value is less than the sum insured. In such cases the insured is required to make no proof as to value. His case is made when he establishes a total loss of the property, and a substantial interest in a subject corresponding to and satisfying the description mentioned in the policy."

The defendant's argument rests upon the fallacious assumption that the plaintiff has parted with its earnings and profits. The 20 elevator companies forming the pool put their profits in the common fund, and it is distributed according to a prescribed schedule of percentages. Presumptively, each company received what it earned, less the small expenses incident to the combination. Instead of retaining its profits primarily, it receives them, for convenience, through an agent. If the gross earnings of the plaintiff were turned over to one of its members to be used by him in defraying the expenses, and then to distribute the net profits among the stockholders, I think there would be no surrender of its receipts. Is it any more so when they are paid to a treasurer in conjunction with 20 other

like concerns, each receiving its aliquot portion through the medium of their common representative? Nor do I think the plaintiff, by joining in this combination, violated that provision of the policy which makes it void "if any change other than by death of the insured take place in the interest, title, or possession of the subject of insurance (except change of occupancy without increase of hazard), whether by legal process, or judgment, or by voluntary act of the insured, or otherwise." This pertains to a change in the use and occupancy which is the subject of the insurance. Of course, if profits are not within the scope of the contract, any transfer of them is not repugnant to it.

It is urged that, inasmuch as the combination agreement provides that "destruction by fire   *   *   *   shall not deprive such elevator representative of his participation in the division of the earnings," the plaintiff, if permitted to recover on its policy, and participate in the common profits as well, obtains double compensation for its loss. The inability to do business by reason of the loss by fire lessens the profits of each elevator company in the association. In the present case it is stipulated that the gross earnings collected by the Western Elevating Association during the time of the interruption of plaintiff's business was $50,000 less by reason thereof, and plaintiff's percentage of that loss was about $3,000. This question, as well as the other upon which defendant hopes to escape payment, depends upon the vital one whether the earnings or their disposition are of any concern to the insurer. By the stipulated facts it appears that since the fire the earnings paid over to the plaintiff by the Western Elevating Association amount to $30,000, and this will be augmented by the further sum of $2,698, and the defendant contends there should be credited on this policy its proportion of these earnings, and which, it is conceded, amount to $614.24. In Foley v. Insurance Co., 152 N. Y. 131, 46 N. E. 318, the policy was upon three dwelling houses in process of construction, which were destroyed by fire. By the terms of the contract between the owners and the builders, the latter were charged with the burden of completing the buildings so that the owners were not liable to the contractors for the materials furnished or the work done. The court held the contract of insurance was unaffected by the agreement with the contractors, there being no exemption clause in the policy. The following is an extract from the opinion at page 135:

"But the contract relations between the plaintiffs and the contractors is a matter in which the defendant has no concern. When the policy was issued, it could not be known whether the contractors would perform their contract. If they abandoned it, the owners would derive such advantages as would accrue from the partial construction of the buildings prior to such abandonment. It is possible that, if the defendant is compelled to pay the policy, the plaintiffs may, if they insist upon their rights against the contractors, get double compensation, unless they should be adjudged to hold the fund recovered for the contractors. But, however this may be, the owners had an insurable interest to the whole value of the buildings on their land; and the defendants neither can compel the plaintiffs to put the loss on the contractors, nor can they resort to the terms of the building contract to diminish the liability for an actual loss within the terms of the policy."

If a portion of a tenement house is destroyed by fire, and the owner is fortunate enough to lease the portion remaining uninjured

for as much as he had been getting from the whole building, the insurer under a policy of this kind is not entitled to a reduction by reason of the fact that the insured sustains no loss in earnings. The difficulty with counsel's argument is that this policy is not unqualifiedly a contract of indemnity. As already stated, it partakes of the character of a valued policy, and, in the absence of fraud, no diminution of the stipulated sum, when adjusted, is permissible to the defendant. The defendant took part in the selection of the appraisers, and I seriously doubt its right to interpose the defense of breach of warranty (Smith v. Insurance Co., 62 N. Y. 85); but I prefer to uphold the claim of the plaintiff on the ground already stated. The policy was prepared by the insurer, and evidently for the protection of its interests, and should be construed most favorably to the insured, if the meaning of any part of it is in doubt. Matthews v. Insurance Co., 154 N. Y. 449–456, 48 N. E. 751, 39 L. R. A. 433. The judgment and order should be affirmed, with costs to the respondent.

Judgment and order affirmed, with costs. All concur.