ject to be defeated as to each by his or her death before Eugene Cruger. If there were no authority, we should think that the plain reading of the statute brought this case within its terms, and made the estate subject to the tax. Such, also, seems to have been the view entertained by the court of appeals. In re Green's Estate, 153 N. Y. 223, 47 N. E. 292. It was there held that the real question was not whether the remainders vested at the time of the creation of the trust, as is the present claim of the respondent, but whether the remainders were intended to "take effect in possession or enjoyment" at or after the death of the donor. In the present case, as in that case, although the remainders must be held to have vested, yet the remainder-man could not have had actual possession and enjoyment, or right of possession, until after the death of the founder of the trust, which did not occur until April, 1898.

It follows that the order of the surrogate should be reversed, and the report of the appraiser confirmed, with costs to the appellant. All concur.

---

(32 Misc. Rep. 393.)

VOISIN v. COMMERCIAL MUT. INS. CO.

(Supreme Court, Special Term, New York County. August, 1900.)

1 INSURANCE—MARINE POLICY—FRAUDULENT DESTRUCTION OF VESSEL—CONSPIRACY—EVIDENCE—BILL OF LADING.

Where a consignor conspires with the master of a vessel in which the goods are shipped to wreck the same, and the vessel is sunk by the master in pursuance thereof, and but a small quantity of the goods which were included in the bill of lading were in fact shipped in such vessel, and the cargo was insured by the consignee, who did not participate in the fraud, and the bill of lading is admitted in evidence on behalf of the consignee, in an action by the consignee on such policy the insurer may show the falsity thereof.

2. SAME—SUFFICIENCY OF EVIDENCE.

A master of a vessel in a foreign port made a contract with a brother-in-law of the consignor of a cargo to be shipped in such vessel that the master should sink the vessel at sea, which he afterwards attempted to do, and much of the cargo was destroyed. The master issued bills of lading for a cargo twice as large as that shipped. The vessel was unseaworthy, and the consignor, who had an interest in the goods, could have shipped them in a sound vessel belonging to a regular line; and after the loss he refused to allow the insurance company which had insured the goods to examine his books, but he testified that he had acted in good faith. In an action by the consignee, who had acted in good faith, on a marine policy covering such goods, the jury found that the consignor was not guilty of fraud. Held, that such finding was not sustained by the evidence.

3. SAME.

The master of a vessel, after having issued false bills of lading in excess of the cargo, and after the consignee had effected insurance thereon, destroyed his vessel at sea, in pursuance of a conspiracy for such purpose, to which the consignee was not a party. In an action by the consignee on the policy the jury found that the consignor was not guilty of fraud, but such finding was not supported by the evidence. The consignee recovered a judgment for the full amount of the policy, though the consignor had an interest in the cargo, the amount of which was not shown; nor was it shown that the judgment was not greater than the consignee's interest in the property destroyed. Held, that a new trial should be

granted, since the consignee was only entitled to recover the amount of his loss.

Action by Stevens Voisin against the Commercial Mutual Insurance Company. Judgment in favor of the plaintiff. Motion for a new trial. Granted.

William Mitchell, for plaintiff.

Evarts, Choate & Beaman (Treadwell Cleveland and Herbert J. Bickford, of counsel), for defendant.

RUSSELL, J. This motion for a new trial and to set aside the verdict for plaintiff in an action upon a marine policy on a cargo of merchandise shipped from Vera Cruz and Tecolutla, Mexico, is the sixth motion of the kind after trials in actions upon similar policies against this and other companies, there having been six trials and four reversals of judgments by the general term or the appellate division; and the inquiry here is whether the present verdict shall meet a similar fate, or prove to be, so far, the sole exception. The defenses to the policy are conspiracy and fraud on the part of the master, William Brooks, and Antonio Hoffman, of Mexico, of the firm of Hoffman Hermanos, to wreck and destroy the vessel and cargo for the purpose of defrauding the insurers, unseaworthiness of the vessel, and unjustifiable deviation at Tecolutla by unnecessary detention and prolonged exposure to the brackish and worm-infected waters of the Gulf of Mexico. The defense of conspiracy and fraud is the only one necessary to be considered on this motion, as the evidence as to ordinary seaworthiness and the causes for detention at Tecolutla, considering those defenses separately from the more serious one, was sufficient for the jury to justify a verdict for the plaintiff within the rules confiding to the discretion of a jury the conclusions to be drawn as to facts to be ascertained by conflicting testimony and inferences. The graver question of fraud presents more difficulty in its solution, partly in reaching an answer to the inquiry as to whether the ascertained facts should have compelled an affirmative response to the question as to whether Hoffman was a participating party in the fraud against the insurance companies, and partly because the case was tried and submitted to the jury by the court upon the erroneous theory that such participation upon the part of Hoffman bound his consignees in New York, so that the plaintiff could not recover upon policies of insurance taken by him, and could not separate and stand upon his interest as a bona fide assignee of the bills of lading, and consignee of one of those bills of lading, to the extent of his actual advances and liabilities for the consignor, and so recover in this case a proportionate amount of those advances in comparison with the total insurance, or at least to the extent of the proportionate value of the goods actually shipped; the evidence for the defense tending to show that only 40 or 50 per cent. of the goods stated in the fraudulent bills of lading were actually placed on board the ship freighted.

The bark selected at Vera Cruz to carry the cargo was the sailing vessel L. E. Cann, which arrived at Vera Cruz in January, 1882,

after a voyage from Cardiff, Wales. After discharging cargo at Vera Cruz, the master, William Brooks, looked around for a freight cargo to New York or elsewhere, and was brought in contact with Antonio Granes, brother-in-law of Malpica, who did the lightering of Hoffman's cargo from the shore to the vessel. He was also brought in contact with Campos, the brother-in-law of Hoffman. The result of this intimacy was an agreement by which Brooks was to wreck the vessel at some place in the Gulf of Mexico or the Atlantic Ocean between the last port of departure in Mexico and the city of New York, and was to receive therefor the sum of $6,500, which was paid to him in installments. On the 24th of January, 1882, three of the bills of lading were made out, and signed by Brooks, of zinc, brass, bones, and rags in one bill of lading, rice root in a second, and duck feathers, goat skins, and coffee in a third. In the first bill of lading it was stated that the merchandise was insured on policies of the consignee for $7,500, in the second by policy of the consignee for $8,000, and in the third by consignee's policy for $14,000. The two bills of lading first mentioned were to L. Contanseau, and by him, on the 13th of February, 1882, assigned to the plaintiff, Voisin. The third ran to the plaintiff, who had been, for some period before, the person to whom Hoffman Hermanos consigned goods for, presumably, purposes of sale in the city of New York. It will be thus noticed that the consignments to Contanseau were insured for only $1,500 more than the consignments to the plaintiff. The consideration of the transfer of the bills of lading from Contanseau to Voisin appears to be the assumption of certain liabilities of Hoffman Hermanos to Contanseau; the payments of Voisin for Hoffman Hermanos to Contanseau, including the liabilities assumed, amounting to about two-thirds of the alleged value of the cargo, which was $29,500, as valued in the policies. It will also be observed that the policies of insurance had not actually been taken out at the time the bills of lading were delivered or assigned, although so stated therein, but were taken after the vessel had received the Vera Cruz cargo referred to in the bills of lading, and after she had encountered such perils of the sea as were incident to the week's voyage from Vera Cruz to Tecolutla, and had remained in the harbor of Tecolutla over one month; the date of the issuing of the policies being March 10, 1882. According to the testimony of the master, Brooks, only from 40 to 50 per cent. of the assumed cargo was actually placed on board. The evidence is very meager as to the actual extent or value of the cargo shipped at Vera Cruz. Nor is this deficiency of evidence remedied by the books of Hoffman Hermanos, they refusing to exhibit their books to the representative of the insurance companies a few months after the wrecking of the vessel. In the latter part of January, 1882, the L. E. Cann sailed for Tecolutla, about 50 miles away, occupying about a week in this voyage, where she remained until about the 30th of March, 1882, excuse being made for the detention that her clearance papers were not right, and that with a small cargo taken on board at Tecolutla the lighterage over the bar at that hamlet was imperfect. Two hundred bags of sand were thrown overboard at Tecolutla, and still the vessel sailed too light for a voyage to New York. April 27th

she became unfit to carry human lives further, at a point about 180 miles east of Charleston, and was abandoned, the crew taking to two boats, and rowing to a vessel which was then in sight. About a month afterwards the L. E. Cann was found floating derelict about 150 miles east of Norfolk, Va., so heavily laden with water that a few more tons would have sunk her, and with 19 auger holes in her bottom. She was taken by a salvage company to Norfolk, and the cargo taken out, a record being made of the articles found, which record showed a great difference between the amounts of goods found in the vessel and those stated in the bills of lading, which could not be satisfactorily accounted for by loss from the buffeting of the waves or washing overboard, especially as to the heavier packages of metals which were packed near the skin of the vessel. Many of the packages had to be opened, showing they were intact, and an average may be so taken of the weights to see how the amounts accorded with the weights of the packages in the bills of lading. It will be remembered that the conspirators did not expect the sea to allow the proof of what the vessel contained, but contemplated that it would hide the traces of their crime, either of the auger holes or the quality or deficiency of the merchandise. Only about one-half of the packages of zinc were found, and those weighed intact only about one-half of the weights of the various packages stated in the bills of lading. Less than one-fourth of the brass packages were found, and those weighed only about one-quarter of the amounts stated in the bills of lading. But little more than half the amount of rags, and one-seventh of the bones, one-third of the rice root, and one-fifth of the coffee were found in the vessel at Norfolk. Out of 865 bags of coffee contained in the bills of lading with those shipped by Granes only 80 bags of coffee were found, but there were discovered at Norfolk 239 bags of corn, packed like coffee, and 186 bags of dirt; 37 of the bags of corn being marked "S. V.," the initials of the plaintiff. No corn was mentioned in any of the bills of lading. Counsel for the plaintiff strongly urges that, if the bills of lading are not common-law evidence of the amounts and kinds of goods shipped, they are not evidence from which a comparison with the amounts found may be drawn. The court admitted the bills of lading, after proof had been taken to sustain the charges of conspiracy and fraud, as evidence of the good faith of the consignors, the element of intent being very material. These bills of lading are instruments proffered by the plaintiff as the foundation of his right to recover, and as the statement of himself and the consignors of what the vessel contained. It is certainly very proper for the defendant to show the falsity of those bills of lading upon the issue of fraud.

Were Hoffman Bros. the plaintiffs in an action to recover upon a policy of insurance on a cargo insured in New York against legitimate perils of the sea, even including the barratry of the master committed against the interest of the freighters, and they produced, to rebut the inferences to be drawn from the facts proven here, no satisfactory evidence of good faith, honest shipment, willingness to produce books showing their purchases of the articles freighted and their shipment,—books which could not be compelled

to be produced in the distant and foreign republic of Mexico,—they or their consignee being the only persons, so far as the evidence displays, who had an interest in hiring the master to wreck the vessel to defraud the insurers, I should have little hesitation in setting aside a verdict which asserted that either the shipment or the insurance was honest. They chose a sailing vessel, already impaired by worms, and liable to further depreciation of security for want of sheathing protection, to transport to New York merchandise which was valuable, if genuinely described, and part of which was perishable, instead of one of the regular line of steamers plying between Vera Cruz and New York. A slow voyage was made to Tecolutla, and a long detention had there for reasons not sufficiently explained. This vessel was doomed, before the bills of lading were given or she sailed from Vera Cruz, to destruction at sea by an evil conspiracy between the master and some one interested in obtaining insurance money upon the cargo. They refrained from personal participation in the delivery at the wharf at Vera Cruz of the cargo they shipped, but selected some broker, whose name they cannot give, and whom research cannot find, for a cargo alleged to be of large value; and, when soon confronted with the indubitable fact that a great crime had been committed, to the possible hazard of the lives of an innocent crew, and asked to show from their books by fair business methods the record of the purchase and the shipment of the articles described in the bills of lading to obtain an honorable and satisfactory cash adjustment for insurances in which the witness Antonio Hoffman confesses they were at least interested to the extent of $10,000 aside from their obligations on the drafts accompanying the bills of lading, declined to give any evidence which it was in their power to produce, preferring to hazard their right of recovery upon the difficulty of the insurance companies obtaining proof, and acted throughout the whole transaction from the initial steps to the close by methods not usual to honest commercial men, and in a manner calculated to produce inferences, not only of their consciousness that there was something to conceal, but of their guarded participation in the inception and consummation of the fraud. The plea that Antonio Hoffman's sworn declaration that he acted in good faith rebuts the evidence of the circumstances sufficiently to sustain the verdict of a jury is hardly justified. With the crime then recent, and the insurance agent seeking information, and the natural desire which every honest business man would have to clear his skirts as well as to speedily obtain his insurance, Antonio Hoffman is asked, in substance: "Where are your books and your bills showing the purchases, payments, the storing account, carting, weighing, lightering of these goods? And as you personally did not ship them, where is the broker who did this work for you, and to whom you intrusted this property you aver to have been of great value?" It will hardly serve as a satisfactory answer to quote his general averment, "I acted bona fide." In the mass of testimony taken in this case during this long trial, who is it that appears by evidence, and not hearsay, to be the gainers by the fraud except Hoffman Hermanos and William Brooks? The evidence in this case

and the strong presumptions required Hoffman Hermanos, by fairly satisfactory proof, to separate themselves from the conspiracy. Wylde v. Railroad Co., 53 N. Y. 156; Ramsay v. Ryerson (C. C.) 40 Fed. 739. And, where a conspiracy is established by prima facie evidence, the acts and declarations of each conspirator in further-ance of the scheme are admissible. Cuyler v. McCartney, 40 N. Y. 221; Indemnity Co. v. Gleason, 78 N. Y. 503. See, also, collection of authorities in Place v. Minster, 65 N. Y. 89. These acts and dec-larations in consummating the contemplated result, which was the receipt of money, until that result is reached, are material. Starkie, Ev. 401, 403; American Fur Co. v. U. S., 2 Pet. 358, 7 L. Ed. 450; Page v. Parker, 40 N. H. 47–62.

It is strongly urged by the counsel for the plaintiff that all of the proof to connect Antonio Hoffman or Hoffman Hermanos with the fraud is that which is commonly called "circumstantial evidence," and is, therefore, weaker than direct or positive proof. The term. "circumstantial evidence" is merely a name for the application of reason to facts. It is convincing when the different circumstances point to a single conclusion. It may be much more satisfactory than the fallible memories of any half dozen witnesses. It is the only kind of testimony which may bring to light the complicity of a principal who necessarily acts through agents, and hides himself from contact with those who execute the crime. This verdict would be set aside even in an action where Voisin, the consignee, and the assignee of the bills of lading, is the plaintiff, were the rule of law adopted by the court upon the trial, and upon which the case was submitted to the jury, still to be accepted as correct. The case was presented to the jury upon the question as to whether Hoffman was a party to the fraud, and by their specific verdict they answered he was not. It was under the same direction of law that their general verdict was rendered in favor of the plaintiff for $7,132.99, the amount of the policy and interest. This rule was adopted by the trial justice because he believed it had been so far settled in these litigations that it was not left open for him to rule otherwise. In all of the previous trials the courts have assumed that Voisin did not insure his interest as consignee, assignee, or factor against the fraud of the consignors or principals, Hoffman Hermanos, in for-warding him a cargo shipped purposely for destruction, and that, as against the innocence of an insurance company ignorant of such felonious scheme, he should be rather the one to be charged with a loss produced by the evil designs of his associates. The initial de-cision of the late general term in this case has served as a guide for the acceptance of this principle by the trial courts. The judgment for the plaintiff, Voisin, was reversed by the general term, Daniels, J., writing the opinion; and, although the reversal was upon errors committed in the reception of evidence, one of the main grounds would have seemed futile had not the court accepted as an under-stood proposition of law the principle that Voisin could not recover if Hoffman Bros. could not. No allusion was made to the possible right of Voisin to recover in part; and the reception of testimony given by Malpica, the lighterman of Hoffman, and by Antonio Hoff-

man, on the issue of conspiracy and fraud as to the goods shipped on the L. E. Cann, of which they did not have personal knowledge, was held erroneous, Judge Daniels saying, "This evidence affected a material part of the case,—that which depended upon the existence of a fraud in the lading of the cargo upon the bark." Voisin v. Insurance Co., 62 Hun, 12, 16 N. Y. Supp. 415. The appellate division, however, has recently in one of these cases met this question in a direct manner, and held that Voisin can recover from the insurance companies to the extent of his advances, or at least to the value of the goods actually shipped, in the absence of direct or presumptive proof that he participated in the fraud. Voisin v. Insurance Co., 51 App. Div. 553, 65 N. Y. Supp. 333. The motion for a reargument was also denied. Thus has been established in this case the conclusion that the trial courts have previously erred in assuming the defendant had a right to an absolute verdict, if the jury found that the consignors, Hoffman Bros., were participants in the fraud by which the vessel was wrecked. Has not, then, the plaintiff here the right to retain his verdict for the full amount of the policy, the jury finding that Hoffman Bros. were not parties to this fraud, and has the defendant the right to complain because the case was presented to the jury in a more favorable way than defendant was entitled to under the law as now ascertained? Theoretically, perhaps, the plaintiff's position is the more consistent with logical reasoning in the application of rules of law to trials in courts of justice. Logically, it seems an anomaly to overturn a verdict which has been rendered in favor of plaintiff, who had to sustain the burden of a harsher rule of law, as applied against his cause, than should have been imposed upon him. Practically, the acceptance of this rule by the jury may have operated in plaintiff's favor. Neither party should suffer by the error of the court. It is a burden to spend a week or ten days more in the retrial of this case, but it is a heavier burden, as it is a wrong, to suffer a verdict to stand without further investigation where it is highly probable the misconceptions the jury innocently or sympathetically made prevented substantial justice, and caused a more severe verdict than would have been the case if the jury had been rightly guided by the court, in which they had the right to have the utmost confidence. As the case was submitted to the jurors, they were required to say that an innocent consignee and holder of bills of lading, who had insured the goods covered, must either recover the whole of the insurance or nothing, and could not be permitted to receive the insurance indemnity up to the extent of his pecuniary interest in the actual cargo. Out of this view was born a great temptation to protect one who was apparently innocent in fact, even to the extent of swaying the reason, and coloring the judgment with a sympathetic tinge of what might seem to those jurors as practical justice. That they would have found otherwise may be inferred from the strength of defendant's case upon the facts, and from the verdicts of four successive juries in favor of the insurance companies upon the facts at issue here. Such verdicts are of weight in the consideration of a later motion for a new trial. 2 Rums. Prac. 417. And, assuming there was fraud on the part of

Hoffman Hermanos, as the facts indicate to the court should be the determination of any tribunal upon the evidence as presented upon this trial, no recovery may be had by Voisin beyond the extent of his advances, distributing those recoveries ratably among the insurance companies. Nor can he, in the case of such fraud, or such a gross overvaluation as creates a gambling policy, or in case of such a mutual mistake of his own and the insurance companies as to the value of the cargo shipped that the one would presumably have not applied for or the others granted insurance to any such amounts, recover ten or fifteen thousand dollars in excess of his own protection, which excess would go into fraudulent pockets, achieve the full result of the conspiracy, and turn a wholesome insurance into an agreement to pay for crime. It is clearly manifest, by the opinion of Justice Ingraham in the Providence-Washington Case, before cited, that the limit of recovery should not pass beyond the value of the cargo, comparing the total insurance with that value as found. It is impracticable for the court to ascertain that value upon a motion of this kind for exact partition of interest between the plaintiff and Hoffman Hermanos, as the valuation of the actual cargo upon the trial was simply approximate for the purpose of the issue of fraud; the estimate of the master, Brooks, even if his testimony could be relied upon, being only a general, and no wise particular, estimate, and it being essential to provide a closer investigation where the amount of recovery is based upon the exact value of the cargo. In this sense, therefore, also, there was a mistrial, for the important fact of valuation was regarded simply as an incidental circumstance, and in no sense as the measure of recovery.

There is ample authority for allowing the considerations adverted to due weight in determining whether, under all of the circumstances attending the trial and the announcement by the appellate division of the rule of law which should govern, for the purposes of substantial justice a new trial should not be awarded. Barrett v. Railroad Co., 45 N. Y. 628, 632; Young v. Stone, 77 Hun, 395, 28 N. Y. Supp. 881. And see the review of the cases referred to by Justice Martin in his opinion in Lund v. Spencer, 42 App. Div. 543, 59 N. Y. Supp. 752. The order asked for is not to give to one party or the other final judgment which takes or withholds the amount in controversy, but to give to both parties a fair opportunity, in the light of the law as settled, to have a jury say what that judgment shall be. Nor can the court, in view of the doubtful evidence of value of the cargo, fix an amount which it may compel the plaintiff to take or suffer a new trial. The only effective way of fairly determining the controversy is to throw all the questions of fact open to the scrutiny of the jury and the further review of the courts. New trial awarded upon payment of the trial fee and trial disbursements.

New trial ordered upon payment of trial fee and trial disbursements.