ant's premises at that time. The evidence is quite general and indefinite, and, while indicating that the channel was deepened through the rock, the court could not formulate a decree therefrom by which defendant's right of revocation could be enforced, without trenching upon the rights of other property owners to have the water course kept open and unobstructed as it originally existed. In order to overcome the presumption of a grant and the acquisition of the right by adverse user, the burden was on defendant to show that the deepening of the channel 42 or 43 years ago was under a license from her predecessor in title. Gould, Waters, § 341; Hammond v. Zehner, 21 N. Y. 118; Townsend v. McDonald, 12 N. Y. 381; Ward v. Warren, 82 N. Y. 265; Heiser v. Gaul, 39 App. Div. 162, 57 N. Y. Supp. 198, and cases cited; Pierrepont v. Barnard, 6 N. Y. 285. The defendant and her grantors having acquiesced for nearly a half of a century in the enjoyment of this improved water course by plaintiff and his predecessors in title, she cannot be permitted to close it entirely now merely on account of its having been artificially deepened and enlarged. Vannest v. Fleming, 79 Iowa, 638, 44 N. W. 906, 8 L. R. A. 277.

It does not appear that the water course overflowed its banks on defendant's premises in consequence of the lateral ditches or drains running into the stream from the premises of plaintiff and others. Artificial lateral drains into a natural water course, although they at times increase the flow of water therein, and at other times decrease it, to the injury of those lower down the stream, with reference to the supply and use of water, are not unlawful, provided the stream is not thereby made to overflow its banks. Waffle v. Railroad Co., 58 Barb. 421, affirmed in 53 N. Y. 11; McCormick v. Horan, 81 N. Y. 86; Noonan v. City of Albany, 79 N. Y. 470; Barkley v. Wilcox, 86 N. Y. 140; Peck v. Goodberlett, 109 N. Y. 180, 16 N. E. 350.

We find no exception which constitutes a reversible error or requires extended consideration. It follows that the judgment appealed from should be affirmed, with costs. All concur, except McLENNAN, J., who dissents.

---

(60 App. Div. 139.)

## VOISIN v. COMMERCIAL MUT. INS. CO.

(Supreme Court, Appellate Division, First Department. April 29, 1901.)

1. NEW TRIAL.

Where a case is submitted on an incorrect theory of the law, and the jury finds a verdict based on that theory, it should be set aside, and a new trial granted.

2. SAME—MARINE INSURANCE—FRAUD—CONSPIRACY.

A new trial in an action on a valued policy was properly granted on the ground that the verdict was excessive where the effect of a charge excepted to by plaintiff, but given without defendant's fault, took from the jury the question as to the quantity and value of goods actually put on board a ship in determining the amount that plaintiff, an innocent transferee of the bills of lading, was entitled to recover, there being evidence that the consignor was a party to a conspiracy to defraud the insurers, and that a large part of the goods described in the bills of lading had not been shipped.

**3. SAME.**

An order granting a new trial on the ground that the verdict for plaintiff is against the evidence must be affirmed if material errors have been committed against defendant, without regard to the question whether the evidence is sufficient to sustain the verdict.

**4. MARINE INSURANCE—EVIDENCE—ADMISSIBILITY.**

Where the issue was whether goods covered by a marine policy had been loaded on a vessel which had been scuttled in pursuance of a conspiracy to defraud the insurers, it was error to permit the consignor, who had no personal knowledge that the goods were shipped, to testify that his firm had purchased the goods included in the bills of lading.

**5. SAME.**

Where the testimony of a witness, who had testified from his own personal knowledge on a former trial as to the quantity of goods actually put on board a ship, was read in evidence under a stipulation in an action to recover on a marine policy, it was error to strike out the testimony as being merely the opinion of the witness on the sole ground that he used the phrase "I think" in answering the questions.

**6. SAME—DECLARATIONS OF CONSPIRATORS.**

Where there was prima facie evidence that the master of a ship and others had entered into a conspiracy to defraud the insurers, the declarations of one of the conspirators made in carrying it out were competent evidence.

Van Brunt, P. J., and Ingraham, J., dissenting.

Appeal from special term, New York county.

Action by Stevens Voisin against the Commercial Mutual Insurance Company. From an order granting a new trial (66 N. Y. Supp. 638), plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, RUMSEY, PATTERSON, and INGRAHAM, JJ.

William Mitchell, for appellant.

Treadwell Cleveland, for respondent.

RUMSEY, J. The plaintiff is the transferee of the bills of lading of certain goods said to have been shipped from Vera Cruz, Mexico, by Antonio Hoffman, doing business under the firm name of Hoffman Hermanos, upon the bark L. E. Cann, upon which he procured valued policies of insurance to be issued by the defendant and other companies. The ship having been lost, he brought this action to recover from the defendant the amount of the policies. It is unnecessary to recite the various proceedings which have been had in this long and unfortunate litigation, but it is sufficient to say that upon the fifth trial the plaintiff recovered a verdict for the full amount of the policy, with interest. That verdict was set aside by the trial court, and a new trial granted, and it is from that order that this appeal is taken.

The defense was that by far the larger portion of the goods insured was never shipped, but that bills of lading had been given for them by the master of the vessel in pursuance of a fraudulent conspiracy, to which Hoffman was a party, to the effect that fraudulent bills of lading should be given for a much larger amount of goods than were actually to be shipped, and that the master of the ship should scuttle it, and abandon it at sea, so that the shippers might recover of the insurance companies for the amount of goods stated in the bills of

lading to have been shipped. It was conceded that the vessel was abandoned at sea by her crew, but did not sink, and, after floating about for some months, was finally recovered, and brought into port at Norfolk. The seriously litigated questions upon the trial, were whether there was such a conspiracy, whether Hoffman was a party to it, and whether the goods mentioned and described in the bills of lading were actually shipped. The learned justice who presided at the trial now under review, granted a new trial upon the minutes not only because the verdict was against the weight of the evidence, but upon the exceptions taken upon the trial, and upon all the grounds stated in section 999 of the Code of Civil Procedure. While the order purported to have been granted upon all those grounds, it is to be assumed, from the opinion of the learned justice, that the special ground upon which he acted in granting the order was that the verdict was against the weight of the evidence, or that the damages were excessive. Upon this trial, as upon all the trials, an effort had been made to show that Antonio Hoffman, the only member of the firm of Hoffman Bros., was a party to the fraudulent conspiracy which the defendant claimed was made. It was assumed by counsel and by the court that, if the defendant was successful in its effort to establish to the satisfaction of the jury that Antonio Hoffman was a party to the fraudulent conspiracy, the plaintiff could not recover. This case was sent to the jury upon that theory, and the learned justice required them to answer the question whether Antonio Hoffman was a party to an agreement to defraud the insurance company. It was answered by the jury in the negative, and upon the theory upon which the question was submitted to them that determination necessarily involved a verdict for the plaintiff for the full amount of the policy, without reference to the fact whether, by mistake or otherwise, a large portion of the goods was not shipped, so that the policy could not have attached to them. The learned justice was not satisfied with the conclusion reached by the jury upon this point, and his order was evidently made upon the ground that the finding that Antonio Hoffman was not a party in the conspiracy to defraud the defendant was against the weight of the evidence, and that they should have found that he was a party, and cognizant of all the things done for the purpose of carrying it out. In the conclusion which he reached upon this motion we fully agree. It is quite true that there was no direct evidence to connect Hoffman with this conspiracy, but upon all the facts it would seem almost impossible that he was not cognizant of what was done while this vessel was being loaded. The evidence establishes beyond any question, in our judgment, the fact that the bills of lading made to him and his firm were fraudulent, not only because they stated to have been shipped a very large quantity of goods which were not shipped, but in that they stated that many of the packages contained valuable goods, while as a fact they contained articles of much less value, or of no value at all. The existence of the conspiracy is conceded by the plaintiff. The relationship of Hoffman to the parties guilty of this fraud, and the fact that no one could profit by it to so great an extent as he, establish the likelihood of his participation in it; and when is added to that the fact that he pretended to have

no personal knowledge of the matter, and relied largely upon the claim that he had purchased these goods, but refused an examination of his books, which would have shown clearly whether or not he ever did buy them, it is quite satisfactorily shown that he was a party to the conspiracy, and knew what was being done by way of carrying it out. As the case was submitted to the jury upon the theory that, if Hoffman was a party to the transaction, the plaintiff was not entitled to recover, and the jury rendered their verdict upon a consideration of that question, then, if that evidence would not sustain the verdict, the case should be sent back for a new trial, although it is now said that this theory was not correct, and that the case should have been submitted to the jury upon an entirely different idea of the law. Whatever may be the correct notion of the law now, when the jury were instructed that a certain fact was decisive of the action, and they reached a wrong conclusion upon that fact, and thereby arrived at an incorrect verdict based upon that theory, justice requires that the verdict should be set aside, and the case sent to another jury, that they may consider it upon the correct theory. The plaintiff in this case is not entitled to retain a verdict which was reached against the weight of the evidence, although the question presented is one which, upon a subsequent consideration of the case, would seem to be less material than was supposed when the case was submitted.

But the learned justice at the trial term presents in his opinion another ground for the granting of this new trial, with which we concur. The jury were told that, if Hoffman was not a guilty participant in this fraudulent conspiracy, the plaintiff was entitled to recover the full amount of the policy, although in fact a very material portion of the goods was not shipped; and it was expressly said to them that they were not allowed to give a verdict for the relative amount of the insurance. The evidence tending to show that a very large portion of the goods called for by the bills of lading was never shipped was cogent; indeed, in our judgment, there can be no question that such is the fact. It will be seen, therefore, that the necessary result of the direction of the court that, if the plaintiff was entitled to a verdict at all, he was entitled to recover the full amount of the policy, deprived this evidence of any force, except so far as it tended to prove that Hoffman was a party to the fraudulent conspiracy. But the law is now settled by this court to the effect that, if Hoffman was a party, yet if the plaintiff show that he or the consignee was a purchaser for a valuable consideration, and procured the policy without knowledge of the fraud, he would be entitled to recover that proportion of the insurance which the goods shipped bore to the goods mentioned in the bills of lading. Voisin v. Insurance Co., 51 App. Div. 553, 65 N. Y. Supp. 333. That this question was an exceedingly material one cannot be denied, because, although it appeared that a large proportion of the goods were not shipped, yet the jury were absolutely precluded from taking that fact into consideration as bearing upon the question of damages. It is quite true that the plaintiff excepted to the charge to the jury that they could not find a verdict for a relative part of the goods, and therefore he cannot be said to be responsible for the error which was committed

in the submission of the case to the jury. But, while that fact relieves the plaintiff from any responsibility which arose, yet it does not take away the injustice done to the defendant by the charge that the jury could not, under any circumstances, render a verdict for the plaintiff for any sum less than the full amount of the policy. It does not appear that the defendant is responsible for this error of the court, and the necessary effect of the charge without any fault of the defendant was to take away from the jury a serious question which ought properly to have been submitted to them as to a fact which, upon the evidence, they could not disregard, and which would very materially diminish the amount of their verdict. A careful consideration of the theory upon which this case was sent to the jury shows that the charge in that regard must have been harmful to the defendant. The theory was that the plaintiff was entitled to recover in any event unless the jury were satisfied that Antonio Hoffman was an actual participant in the fraudulent conspiracy. When they had disposed of that question in the negative, they necessarily were to give a verdict for the plaintiff. It may be said that that direction was erroneous. But that is of no importance after the jury have determined that the plaintiff was entitled to a verdict. The amount of the verdict was still to be fixed, and upon that question they should have been permitted to consider the quantity and value of the goods actually put on board, because the law is that under no circumstances can any one recover the full amount of the policy if a large portion of the goods insured was not shipped. Voisin v. Insurance Co., 51 App. Div. 553, 65 N. Y. Supp. 333. So it will be seen that the failure to say to the jury that they might not render a verdict for the proportionate value the goods shipped bore to that of the quantity mentioned in the bills of lading, even upon the theory upon which the case was submitted, was harmful to the defendant, because it was satisfactorily shown that by far the greater part of the goods mentioned in the bills of lading was not put on board the ship, and the verdict was therefore excessive. The learned justice was therefore correct in giving this as a reason why the new trial should be granted. In the case of Layman v. Anderson, 4 App. Div. 124, 38 N. Y. Supp. 883, a new trial had been granted upon the ground that the verdict was against the weight of the evidence, and upon an appeal from that order solely upon that ground this court reversed it. The case afterwards came on to be heard upon exceptions. The point was then taken that, as these exceptions were properly before the court upon the appeal from the order granting the new trial, and as the court had reversed that order, it necessarily followed that the rulings made by the court to which the exceptions had been taken had been sustained, and therefore the determination in the former appeal was a conclusive adjudication that the proceedings upon the trial had been correct. That proposition was sustained by this court, and a reargument of the appeal from the order granting the new trial was directed, so that the exceptions might be considered; and upon the argument of that appeal this court, adhering to its determination that the court erred in granting the new trial because the verdict was against the weight of the evidence, nevertheless affirmed the order because the

exceptions were well taken. So, therefore, upon this appeal, not only are we not precluded from considering the exceptions taken upon the trial, but within the later case of Layman v. Anderson, 22 App. Div. 152, 47 N. Y. Supp. 955, we are bound to consider them, and, if we come to the conclusion that material errors were committed upon the trial against the defendant, we are bound to affirm the order, without regard to the question whether the finding of the jury upon the evidence can be sustained.

An examination of this case satisfies us that there were several erroneous rulings upon the trial. As has already been made to appear, a serious question upon the trial was as to the quantity of the goods which had actually been shipped. The claim of the defendant was that there was a conspiracy between the master and several other persons—among them the shipper of these goods—to the effect that false bills of lading should be made; that the captain should scuttle his ship, so that there might be recovered from the insurance companies, including this defendant, the full amount of the insurance, although packages mentioned in the bills of lading contained filth and dirt of various kinds, instead of such valuable goods as were said to have been shipped. It was admitted upon the trial that there was a conspiracy between certain parties other than Hoffman to scuttle this ship. That conspiracy being admitted, it will be seen that it was exceedingly important to show to what extent it was carried out with respect to the shipment of goods. The plaintiff undertook to show that substantially all the goods mentioned in the bills of lading were shipped, and for that purpose he called one Malpica, who testified that certain packages were put aboard the ship, and he was able, by refreshing his memory, to recall the number of packages, although he was not able to state what they contained, nor how large a quantity of any particular kind of goods was shipped. After his testimony was given, a commission addressed to Antonio Hoffman was offered in evidence. He, being asked whether his firm shipped any goods to the port of New York upon a vessel sailing from Vera Cruz in 1882, testified that all he knew about it was that he had receipts for the delivery of goods and bills of lading given to the captain, and that in fact goods were shipped by Malpica; but he had no further personal knowledge of the shipment of the goods. It has been held upon one of the former trials of this case that Hoffman's testimony as to the shipment of the goods was not competent, as it was based only upon information derived from the bills of lading. Voisin v. Insurance Co., 62 Hun, 4, 16 N. Y. Supp. 410. In accordance with that ruling, the testimony of Hoffman as to the actual shipment of the goods was excluded. He was then asked, "Please state as fully as you can the person or persons, firm or firms, from whom the firm of Hoffman Brothers acquired the goods, if any, shipped on board the bark L. E. Cann in or about the month of January, 1882." That question was objected to upon the ground that he had no personal knowledge that the goods were shipped, and therefore the evidence was incompetent; and upon the further ground that it was immaterial, because it did not appear that any goods had been shipped. The objection was overruled, and the witness was permitted to answer to that and

subsequent questions upon the same subject that his firm had pur-
chased of various persons the goods which were included in the bills
of lading.   We think that this testimony was clearly not competent.
The only way in which it was important was as tending to show that
certain goods had been shipped by the firm of Hoffman Bros. upon
this vessel in the month of January, 1882.   As to the actual fact of
the shipment Hoffman conceded that he had no personal knowledge,
and at the time the evidence was given no evidence whatever had
been given to show the shipment of any particular quantity of such
goods, nor, indeed, had any competent testimony been given to show
the shipment of any goods at all.   It is quite true that Malpica had
testified that he had carried goods from the shore to the ship, and he
was able to state the number of packages, and that, some being torn,
he saw what they contained; but he had no other knowledge as to
the quantity or kind of the goods shipped, or as to the places whence
they had come, or the persons who had supplied them; and there was
no testimony as to the shipment of any goods by Hoffman Bros., be-
cause at that time the bills of lading had not been put in evidence.
Therefore the testimony which Hoffman gave amounted to proof not
only that he had bought certain goods, but that they were shipped on
the L. E. Cann; but, although he may have known that he had bought
the goods, he had no personal knowledge of the fact of shipment.   As
the interrogatory applied only to goods shipped, the jury must have
received it not only that the goods were bought, but that he identi-
fied them as the goods which were shipped on the bark.   This testi-
mony was exceedingly important.   The evidence as to the shipment
was very meager, and his evidence was an essential link in the chain
of facts by which the plaintiff sought to prove his case.   But it is evi-
dent that the question required Hoffman to testify as to a fact as to
which he himself admits that he had no personal knowledge.   There-
fore this testimony comes within the condemnation of the court upon
the first appeal, where it was held that the ruling of the court in that
regard was erroneous.

. A witness upon whom the defendant relied to establish the fact
of the conspiracy and the falsifying of the bills of lading was one
Brooks, who was the master of the ship; and he testified as to the
conspiracy, the circumstances under which it was made, the persons
who were in it, and the way it was carried out.   He undertook to
testify as to the quantity of certain goods shipped, and this testi-
mony went directly to the fact in issue.   He was asked to state how
the actual cargo shipped compared with the cargo stated to have been
shipped in the bills of lading.   There can be no question as to the
grave importance of that question.   An objection was taken to that
question, and, although the court did not rule that that question was
incompetent, the objection was sustained as to the answer on the
ground that the witness stated that "I think" there was a difference
of between 50 and 60 per cent.; and the answer to that extent was
stricken out, the reason given being that it was clear that the wit-
ness did not testify from his personal knowledge or recollection, but
because he used the word "think" it was necessarily to be inferred
that he only gave an estimate.   As to the particular answer the error

was cured, because the question immediately afterwards asked was: "Q. That is, you gave bills of lading for 60 per cent. more than there were actually shipped? A. Yes, sir; the number of packages." So it it is clear that as to this answer no harm was done by the ruling. It is referred to, however, because it was the foundation of a similar ruling very hurtful to the defendant. It had been stated that a certain number of packages of goatskins had been shipped, and the bills of lading called for 15. The question was asked, "Do you remember how many bundles of skins were received at Vera Cruz?" and his answer was: "I think there were five or six, I don't think there were more than that." It is evident that this evidence was material. It was objected to upon the ground that it was merely the opinion of the witness, and it was sustained upon that ground. It is to be remembered that this evidence was not given on this trial for the first time, but it was the testimony of the witness given on the previous trials, which was read by stipulation, and had been apparently received upon the former trial without objection. The witness was not present, so that the defendant offering it had no opportunity to ascertain whether or not his use of the word "think" meant simply that the witness was expressing his opinion, or that he was using it in the ordinary sense of the word when one is testifying as to a fact within his knowledge, but as to the accuracy of which he is not sure. It seems to us that, when this witness used the words "I think" in that connection, it is fairly to be inferred that he was testifying from his own knowledge. The whole case shows that he did have personal knowledge of the goods which were put aboard the ship, and when he was asked as to a fact presumably within his knowledge there necessarily arises a presumption that, although he used a form of expression customary among men not able to speak precisely with respect to the fact asked about, he was testifying from his own knowledge, and meant only that he was not certain as to the exact number of the bundles of skins put on board. The court was not, therefore, justified in assuming that, because that phrase was used, the witness was testifying simply as to a matter of opinion, and for that reason to strike out the testimony. A like error was made by striking out the testimony of the same witness as to the number of bags of coffee actually put on board. The bills of lading called for 430 bags shipped by Hoffman. Brooks' testimony was that only six or seven were actually shipped by him. It was important to show, not only the fact that there was a conspiracy, but also what was done in pursuance of it; and the rule is well settled in that regard that, where prima facie evidence of a conspiracy is given, the declarations of the conspirators made in carrying it out are competent evidence. People v. Van Tassel, 156 N. Y. 561, 51 N. E. 274. One essential part of this conspiracy was that the shippers should put on board the vessel packages of dirt and filth, and other articles of no value, under the name of valuable articles, and they should be received as goods of value, and so entered in the bills of lading. The captain of the ship was asked what was stated by the conspirators in his presence with respect to this matter, and he undertook to testify that certain of the conspirators stated that vanilla bean bags were to be filled with dirt

and refuse, and that a large lot of stems and tobacco sweepings from the floor were to be entered as good tobacco, and so put on the bills. of lading. These declarations were made by one whom the evidence shows was a party to the conspiracy, and at a time when the transaction was still going on, and while the goods were being shipped. on the bark. The declarations of Burrill and Jubilac on those subjects were excluded. Both of these men were parties to the conspiracy, and we think that this evidence was competent, and should. have been received. 1 Greenl. Ev. § 111.

It is unnecessary to consider the other rulings upon the trial. Whether we say that the jury erred in their conclusion that Antonio Hoffman was not a party to this transaction, so that the defendant was deprived of its right to recover a verdict because of that erroneous finding, or whether we say that there were errors upon the trial which were harmful to the defendant, in either case the order of the trial court was correct, and should be affirmed, with costs to the respondent to abide the event of the new trial.

HATCH, J., concurs.    PATTERSON, J., concurs in result.

INGRAHAM, J. (dissenting). This case has been tried five times. Twice the plaintiff has had a verdict, once the complaint was dismissed, once the defendant had a verdict, and once the jury disagreed. Upon the fifth trial certain specific questions of fact were submitted. to the jury, and answered in favor of the plaintiff, and there was a general verdict for the plaintiff for the full amount claimed; but upon a motion made on the judge's minutes the verdict was set aside, and a new trial granted, and the case now comes to us on an appeal from the order entered on that motion. The action was brought to recover upon a policy of marine insurance whereby the defendant insured the plaintiff, "on account of whom it may concern," by a valued policy, upon a certain cargo shipped by Antonio Hoffman upon the bark L. E. Cann on a voyage at and from Tecolutla, Mexico, to New York, "upon all kinds of lawful goods and merchandises laden or to be laden on board the good bark L. E. Cann. * * * Beginning the adventure upon the said goods and merchandises from and immediately following the loading thereof on board the said vessel, at ——— aforesaid. * * * The said goods and merchandises hereby insured are valued at (including premium) $29,500." The perils insured against are "of the seas, * * * barratry of master mariners, and all other perils, losses, and misfortunes that have or shall come to the hurt, detriment, or damage of the said goods and merchandises, or any part thereof." This vessel took on board a portion of the cargo at Vera Cruz, then proceeded to Tecolutla, Mexico, when she completed her cargo, and from there sailed for New York. Subsequently she sprung a leak in the Atlantic Ocean, and was abandoned on the 27th of April, 1882, about 180 miles from Charleston, S. C. In the following June she was discovered still afloat, and was towed into Norfolk, Va. The further facts are stated in an action brought by this plaintiff against the Providence-Washington Insurance Company (Voisin v. Insurance Co., 51 App. Div. 553, 65 N. Y. Supp. 333), and

it is not necessary to restate them here. The question of fact was submitted to the jury by the learned trial judge with a charge which seems to have been entirely satisfactory to the defendant, as no exception was taken to it, and the defendant submitted but one request to charge, which did not relate to any question which is important upon this appeal. The judge submitted three questions to the jury: First. Was Antonio Hoffman a participating party to the agreement to defraud the insurance company? Second. Was there a deviation from unreasonable and unnecessary delay at Tecolutla? Third. Was the L. E. Cann seaworthy to encounter the ordinary perils of the sea when she left Tecolutla on a voyage to New York? To the first two questions the jury answered "No," and to the last question they answered "Yes," and to the general question whether they found for the plaintiff or the defendant the jury found in favor of the plaintiff for $7,132.99; the court having charged the jury that if they found, in answer to the first special question, that Hoffman was a participating party to the agreement to defraud the insurance company, they must find a verdict for the defendant. To this direction counsel for the plaintiff excepted, saying: "I except to your honor's refusal to permit the jury to pass upon the question as to the quantity of goods which was in fact shipped, and your charging the jury that they could not find pro tanto." To this the court replied: "I will give you a square exception on that. I do allow them to pass upon the quantity as a fact, but I do not allow them to give a verdict for Mr. Voisin for the relative amount of insurance." Counsel for the defendant took no exception to this charge of the court, made no request to charge that, in case the jury found for the plaintiff, they could find less than the full amount of the policy, and accepted the benefit of the instruction which required that the defendant should have a verdict if Hoffman participated in the fraud. In this case a jury had once before, upon a similar question being submitted to them, found that Hoffman did participate in the fraud, to which allusion will be made, and another jury had found that Hoffman did not participate in the fraud. The defendant thus had the full benefit of an instruction by which the plaintiff was made responsible for Hoffman's fraud if he was guilty, and that defendant was relieved from responsibility under this policy of insurance if they found that Hoffman participated in the alleged conspiracy. After the trial, but before the decision of this motion, the case of this plaintiff against the Providence-Washington Insurance Company, supra, which related to a similar policy of insurance issued by the defendant in that action upon this same cargo, came before us, and we held that, if Hoffman did participate in the fraud, this plaintiff would, notwithstanding, be entitled to indemnity to the extent that he had become the owner of the goods that were actually shipped upon this vessel; that, the policy being a valued policy, upon proof that the cargo was actually placed upon the vessel the plaintiff was entitled to recover, unless the defendant could show that the whole cargo upon which the valuation had been placed had not actually been shipped, in which case the plaintiff would be entitled to recover only an amount equal to the proportion that the cargo which was actually shipped bore to the entire cargo that was valued in the

policy. After this decision was announced, the learned trial judge granted this motion upon the ground that he had refused to allow the jury to pass upon the question as to whether or not the total cargo was shipped, and that, as in such a case the plaintiff would not be entitled to recover the whole amount claimed, he thought that a new trial should be granted. The question that presented itself to him is thus stated in his opinion:

"Has not, then, the plaintiff here the right to retain his verdict for the full amount of his policy, the jury finding that the Hoffman Hermanos (Hoffman) were not parties to the fraud; and has the defendant the right to complain because the case was presented to the jury in a more favorable way than defendant was entitled to under the law as now ascertained? Theoretically, perhaps, the plaintiff's position is more consistent with the logical reasoning in the application of rules of law to trials in courts of justice. Logically, it seems an anomaly to overturn a verdict which has been rendered in favor of the plaintiff, who had to sustain the burden of a harsher rule of law, as applied against his cause, than should have been imposed upon him. Practically, the acceptance of this rule by the jury may have operated in the plaintiff's favor, * * * where it is highly probable the misconceptions the jury innocently or sympathetically made prevented substantial justice, and caused a more severe verdict than would have been the case if the jury had been rightly guided by the court, in which they had the right to have the utmost confidence. As the case was submitted to the jurors, they were required to say that an innocent consignee and holder of bills of lading, who had insured the goods covered, must either recover the whole of the insurance or nothing, and could not be permitted to receive the insurance indemnity up to the extent of his pecuniary interest in the actual cargo. Out of this view was born a great temptation to protect one who was apparently innocent in fact, even to the extent of swaying the reason and coloring the judgment with a sympathetic tinge of what might seem to those jurors as practical justice. That they would have found otherwise may be inferred from the strength of the defendant's case upon the facts."

There is nothing in the record of the trial which would suggest that the jury were influenced in any way by the considerations which are here adverted to, and which the court had thought might possibly have influenced the jury. The question as to Hoffman's fraud was the main question that was litigated. The defendant claimed upon the trial, and claims upon this appeal, that the finding that Hoffman was not guilty of the fraud was not sustained by the evidence; but we think that upon a fair consideration of the testimony it was at least a question for the jury to say whether Hoffman participated in this fraud, and that the finding of the jury that Hoffman was not such a participant is sustained by the evidence. The captain of this vessel testifies that he entered into a conspiracy with one Granes a resident of Vera Cruz, by which Granes was to charter the vessel, ship a bogus cargo to New York, and the vessel was to be sunk at sea and abandoned, and for this the captain (Brooks) was to be paid $6,500; that a cargo that was to a large extent bogus was put on the vessel at Vera Cruz and Tecolutla, and with it she sailed for New York. Brooks does not testify that Hoffman was connected with this conspiracy, and, but for the fact that when this vessel arrived at Norfolk, Va., a considerable portion of the cargo which it was claimed Hoffman had shipped had disappeared, there would be no evidence to connect him with it; and this fact of the deficiency between the cargo that Hoffman claimed to have shipped and for which

he received bills of lading and the cargo found in this vessel upon her arrival at Norfolk is the fact that has been most relied on to show that Hoffman must have shipped a much smaller cargo than was covered by the bills of lading upon which the valuation was based, with the intention of defrauding the insurance company when the vessel was lost. If this fact was proved, and if the jury had believed that Hoffman had furnished a fraudulent cargo, taking bills of lading which showed a large excess in the amount shipped, it is somewhat difficult to see how they could have found that Hoffman was not a party to the fraud. There is certainly nothing in the record that justified the trial judge in assuming on the motion, or that would justify us in assuming upon this appeal, that the jury were swayed "with a sympathetic tinge of what might seem to those jurors as practical justice" to decide a question of fact contrary to their convictions. The question of Hoffman's participation in this fraud was submitted to them in a charge which certainly bore as strongly towards a finding in favor of an affirmative answer to this question as was justified by the evidence. Their attention was called to all the facts relied on to prove Hoffman's fraud, and they were squarely instructed that, if that was proved, it was their duty to say so, and find a verdict for the defendant; and in the face of this instruction they found that Hoffman was not a party to the fraud. I can find nothing tending in the slightest degree to show that that verdict was not the result of a fair, honest, and impartial consideration of the testimony; and certainly, upon my view of this testimony, there was nothing to justify the court in setting aside the verdict as contrary to the weight of evidence. The jury, to have found Hoffman innocent, must have found, under the charge of the court, that Hoffman shipped the goods described in these bills of lading, and upon which the valuation contained in the policy was based; and it seems to me that, if this finding that Hoffman was not a party to the fraud was sustained by the evidence, the plaintiff was entitled to hold the verdict in his favor.

In determining this question we must consider for a moment upon whom rests the burden of showing that the cargo represented by the bills of lading, and which was the basis of the valuation of the policy, was not actually shipped. As before stated, the policy was a valued one, and it has always been the rule that the value of the goods stated in a valued policy is, in the absence of fraud, conclusive between the parties, however largely in excess of the true value. Voisin v. Insurance Co., supra, and cases there cited, to which may be added Kane v. Insurance Co., 8 Johns. 229; Cushman v. Insurance Co., 34 Me. 487; Boardman v. Insurance Co., 146 Mass. 443, 16 N. E. 26; Dumas v. Insurance Co., 12 Serg. & R. 437. Upon proof, therefore, that the cargo thus valued in the policy was shipped, that value, in the absence of fraud, became conclusive as the value of the cargo that was lost; and, if the defendant wished to obtain the advantage of the rule laid down in Forbes v. Aspinall, 13 East, 324, which we held applicable to cases under these policies in the Providence-Washington Ins. Co. Case, supra, the burden was on the defendant to show what part, if any, of the goods which were the basis of the valuation in the policy were not shipped. The defendant insists

upon this appeal that there was no evidence to show that the goods represented by Hoffman's shipment were actually shipped. That question was determined by the late general term of the supreme court in the appeal from the judgment entered upon the dismissal of the complaint in this case (67 Hun, 365, 22 N. Y. Supp. 348), where, after discussing the evidence of the shipment introduced by the plaintiff, the presiding justice in his opinion says: "This evidence is certainly as strong as that which was presented in Palmer v. Insurance Co., 116 N. Y. 599, 32 N. E. 5;" and it was held that the proof of the shipment of the cargo was sufficient to sustain a finding by the jury that the cargo was actually shipped. The main evidence, apart from the condition of the cargo at Norfolk, that questions the shipment by Hoffman, is that of Brooks, the master of the ship, who was concededly a party to the conspiracy. He says, speaking generally of the cargo, that he gave bills of lading which called for 50 to 60 per cent. more than had actually been placed on board. Considering the conduct of Brooks, and the facts that at this time, when he testified he was in the pay of the defendants, he had committed a crime for which the insurance company could procure his severe punishment, that he confesses that he had committed that crime, and that he had received the price that he was to be paid for committing it, his testimony certainly cannot be considered as being of much weight, unless corroborated. The main fact relied on to corroborate him is the evidence of the goods found upon this vessel when she arrived at Norfolk. The vessel was abandoned in the Atlantic Ocean on the 27th of April, 1882, and remained as derelict until some time in June, when she was discovered and towed to Norfolk, Va. When she was discovered she was barely afloat, her cargo being all submerged, and a considerable portion of the deck,—from 25 to 30 feet,—extending the whole width of the vessel, was torn out. All her spars and some of her deck beams were gone. What happened to her during this period of over a month is not disclosed. She was at the mercy of the winds and waves and of passing vessels that might see fit to help themselves from her cargo. She was just afloat, one of the witnesses saying that five tons more would have sunk her. After the vessel arrived at Norfolk, she seems to have been taken possession of by representatives of the insurance companies. Two boxes were taken out by a diver. After these two boxes were taken out, the vessel was towed up to Norfolk, and there unloaded. There was evidence of various witnesses who weighed portions of the cargo discharged from the vessel. A witness named Battley testified as to certain goods that he weighed, but he does not state that he weighed all the goods that came from the vessel. He seems to have weighed some yellow metal, rags, bones, and fustic. Sparrow, an inspector of customs at Norfolk, Va., testified that by the directions of the collector of the port he superintended the delivery of the cargo from the L. E. Cann from beginning to end. He produced a list, which he swore was "a correct list of the cargo as taken out by me on the various days"; that he did not do any weighing, but that he saw all this cargo himself as it came out. A man named Mundin was also called as a witness, and testified that he was ordered to take charge

of the L. E. Cann as night watchman, and relieve the witness Sparrow, who was there by day, and that nothing was removed from the vessel while he was watchman. He does not state when he first took charge, or how long he continued in charge. Another witness testified that he was a submarine diver, but that he took out no part of the cargo, except some bundles of broom straw. Holmes testified that he went to work on the Cann on the 15th of July, and he produced a list of the articles that were discharged from the ship on various days from the 5th of July to the 20th of July, and this list includes all the cargo that was taken from the vessel in his presence. He nowhere testified, however, that this list was all of the cargo of the vessel; and this list appears to have been a copy of the one produced by Sparrow as to the contents of the vessel. There was also introduced a certificate of one Banks, a weigher, who certified that he had weighed certain packages of zinc, scrap metal, rags, and bones on board the Cann, but just how much that was of the cargo which was removed does not appear. Brown testified that he was sent to take charge of the Cann by the insurance companies, and found her on the Horseshoe Shoals on the 1st of June; that she was then in charge of the tugboats which had brought her in from sea. The vessel was then taken into the Norfolk river, and grounded at quarantine, and then the discharge of the vessel was commenced. The cargo was taken out of the vessel, and placed on lighters, and carried to a wharf at Berkely, and there stored until sold; that all the cargo was taken out of her and put into the lighters. Some few packages were taken out after she was alongside the wharf at Berkely. This witness testified that all of the cargo which was in the Cann was put on these lists produced by the two witnesses to which attention has been called; that in towing the vessel up from the Horseshoe to quarantine two bales of tobacco were washed out, but were recovered. This evidence as to the cargo that was taken from the vessel at Norfolk and the weight of the articles would probably be sufficient for the jury to find that all of the articles that were upon the vessel at the time she arrived at Norfolk were accounted for, I do not think it was of a character that would require such a finding. There is nothing to show what happened to this cargo during the time that the vessel was a derelict on the ocean, and, as it appears that she was in such a condition that in towing her from the Horseshoe Shoals to Norfolk two bales of tobacco were washed out, it certainly was not unreasonable under the circumstances detailed for the jury to come to the conclusion that a large portion of the cargo had been lost while she was floating about abandoned at sea, and before she arrived at Norfolk. It is said, however, that the metal could not have been washed out; but the evidence that all of the metal laden upon this vessel was placed under the other portion of the cargo, with the metal that was in her when she arrived at Norfolk, is not entirely satisfactory. All that we have is the evidence of Tedford, the mate of the vessel, that the zinc was stowed in the lower hold next to the skin, and that the copper was stowed down in the bottom, the same as the zinc and the brass. Except this general statement, there is nothing to show that the metal was not in such a position that dur-

ing the period while the vessel was a derelict a portion of it could have been washed overboard, or in some way lost.

The defendant introduced letters written by Granes, who, if the captain is to be believed, was the principal conspirator, and who shipped a large part of the bogus cargo upon this vessel, as declarations of a co-conspirator; and, assuming that Granes and this captain united to defraud the insurance companies, the statements in these letters are important to show what relation, if any, Hoffman had to Granes in this understanding with Brooks. On the 26th of December, 1881, Granes wrote to Messrs. Thurber & Co., of New York, who was his consignee, stating that the L. E. Cann could be chartered, and that by chartering her he would have the advantage of being able to take on freight here from two or three merchants, 200 tons of bones, fustic, broom corn, and other articles. On a subsequent day of July he informs his correspondent in New York that he had chartered the Cann, and then he states:

"As it so happens in this case that the vessel is too large for me, I find myself obliged to accept cargo on freight, having to take it at a lower rate than the current one, so as to induce those who have cargo to send it by this bark. I choose this method because I presume it will be safer for me; for, the contract freight of the vessel being $6,000, it may happen that I shall obtain at least half of the capacity of the vessel among various shippers who have offered me their cargo."

And in a letter dated January 12, 1882, Granes says:

"I have been able to persuade four firms in this city to ship 200 or more tons, yet I have had to make a slight concession in the rate of freight to two of them below what I am paying."

On January 26, 1882, he inclosed to his correspondent the bills of lading of the cargo, and a copy of the freight list, "that you may see what you have to collect in freight being $1,417.75." There is certainly nothing in this correspondence to indicate in any way that these shippers of freight were engaged with Granes in the conspiracy to ship goods which it was expected would be lost, or that their shipments were not made in good faith; and the assumption that Granes had put on board a bogus cargo would explain the fact that there were boxes of dirt and other refuse which were found at Norfolk, without conclusively establishing that Hoffman's shipment was not an honest one. The defendant laid great stress upon the refusal of Hoffman to show his books to Brown, the agent of the insurance companies, when he went to Mexico; but at this time the insurance companies were contesting the claim, the action having been brought in August, and this demand by Brown was in December, 1882, or January, 1883. It is not surprising under these circumstances that Hoffman should decline to exhibit his books of account to the agents of the insurance companies who were charging him with fraud, and with being a party in such a conspiracy as is charged in this case.

We thus come back to the consideration of whether, upon all the testimony, the verdict of the jury that Hoffman was not a party to this conspiracy, and that he did ship upon this vessel the goods described in this bill of lading, and upon which the value of this cargo, as shown by the policy of insurance, was based, was against the weight of evidence. I think, taking the whole testimony together, it

was at least a question for the jury as to whether Hoffman did, as a fact, take part in this conspiracy, and whether he had, as a fact, shipped the cargo upon which this valuation was based, and that the verdict of the jury was sustained by the evidence. In this state of the proof there certainly does not seem to be any justification for the assumption that the verdict was induced by any sympathetic desire to aid the plaintiff in swindling the defendant. This being so, what basis is there for the supposition that, if the question as to whether or not all of the goods represented by these bills of lading, and upon which was based the value claimed in the policy, had been submitted to the jury, they would have found that all of the goods were not shipped? I can see nothing to suggest any reason why they would have found that all of the goods were not shipped if they found that Hoffman was not a party to the fraud. As before stated, the court left the question as to whether Hoffman shipped all the goods represented by the bills of lading to the jury in considering the question as to whether or not Hoffman was engaged in this fraudulent conspiracy, and there is at least a fair presumption that they considered that question, and determined that the goods were shipped, in considering whether or not Hoffman was a participant in the fraud; but, even if this conclusion cannot properly be drawn, we have the fact that it was the plaintiff who wished that question left to the jury; that the court refused to submit it; that the defendant took the benefit of that refusal by having the jury directly instructed that, if Hoffman was implicated in the fraud, the plaintiff could not recover, taking the chance of a finding that Hoffman was guilty of fraud, from which would result a verdict for the defendant,—a position which had been insisted on by the defendant since the commencement of this litigation. And the defendant, having made no claim that a different rule should be adopted, not asking for an instruction which would allow the jury to find a verdict for the plaintiff although Hoffman was guilty of the fraud, is in no condition now to claim, having taken the advantage of the ruling of the court and the chances of a favorable finding upon the question as submitted, that there should be a new trial, so that an instruction could be given to the jury which the defendant has always vigorously opposed. It is conceded that no exception taken by the defendant presents this question. The verdict of the jury is not against the weight of evidence, and to allow a defendant in an action of this kind, with a ruling that is strongly advantageous to it, to take the benefit of that ruling, with a chance of a successful recovery, and, after failing in that chance, to obtain a new trial because the rule of law was announced too strongly in his favor, would certainly seem not only as the court below stated, not "consistent with the logical reasoning in the application of rules of law to trials in courts of justice," but would be a great injustice to the plaintiff.

There are no exceptions to the rulings upon evidence presented by counsel for respondent as sustaining the order appealed from that require notice, and, assuming that the rule as applied upon the trial was to the advantage of the defendant, the fact that such a rule was error did not justify the court in granting a new trial. My con-

clusion, therefore, is that the order appealed from should be reversed, with costs, and the motion denied, with $10 costs and disbursements.

. VAN BRUNT, P. J., concurs.